**In re Richard Kevin HICKS, Rebecca Grace Hicks, Debtors.**

**Rebecca Grace Hicks, Plaintiff,**

**v.**

**Educational Credit Management Corp., Defendant.**

**Bankruptcy No. 02–44290–HJB.**
**Adversary No. 03–04010.**

United States Bankruptcy Court, D. Massachusetts.

Sept. 12, 2005.

Mark L. Hare, Springfield, MA, for Debtors/Plaintiff.

### MEMORANDUM OF DECISION

HENRY J. BOROFF, Bankruptcy Judge.

Before this Court is a complaint filed by Rebecca Hicks against the Educational Credit Management Corporation ("ECMC"), the current holder of her student loans. Through her complaint, Rebecca Hicks asks this Court to rule that those student loan obligations are dis-

chargeable under § 523(a)(8) of the Bankruptcy Code.[1]

## I. INTRODUCTION

### A. Background and Travel of the Case

Rebecca Hicks and her husband, Richard Hicks, (jointly, the "Debtors") filed a joint petition for relief under Chapter 13 of the Bankruptcy Code on July 10, 2002. Shortly thereafter, they converted their case to one under Chapter 7. On April 23, 2003, the Debtors received a discharge pursuant to § 727.[2]

In January of 2003, Rebecca Hicks commenced the present adversary proceeding by filing a complaint[3] against ECMC, the current holder of student loans used by Rebecca to finance her graduate education.[4] In her complaint, Rebecca alleges that repayment of her student loans would result in "undue hardship" for the Debtors and their dependents and the debt should therefore be discharged pursuant to § 523(a)(8).

ECMC filed an answer to the complaint in which it argued that the facts as alleged did not prove the requisite "undue hardship." A trial ensued, at the conclusion of which the parties filed post-trial memoranda addressing the legal standard to be used in determining "undue hardship" under § 523(a)(8). After the parties submitted the requested memoranda, the matter was formally taken under advisement.

## II. THE STANDARD FOR "UNDUE HARDSHIP" UNDER 523(A)(8)

### A. Positions of the Parties

Rebecca Hicks, through counsel, urges this Court to adopt the so-called "totality of the circumstances" approach toward determining undue hardship under § 523(a)(8). Pointing to the adoption of this standard by many courts within the First Circuit and relying primarily on Judge Haines' opinion in *Kopf v. United States Department of Education (In re Kopf)*, 245 B.R. 731 (Bankr.D.Me.2000), she argues simply that a totality of the circumstances standard allows the Court to consider all relevant circumstances and facts as appropriate to the specific case without placing an unwarranted dispositive emphasis on any one factor.

Counsel for ECMC, however, argues that this Court should adopt the so called *"Brunner* test" as the singular standard for such undue hardship determinations. Because eight Circuit Courts of Appeals have expressly adopted the *Brunner* test, ECMC contends that the failure of this Court to do the same will result in "unpre-

---

1. Unless otherwise stated, all statutory references will be to the Bankruptcy Reform Act of 1978, as amended, found at Title 11 of the United States Code, §§ 101 *et seq.* (the "Bankruptcy Code" or the "Code").

2. Section 727 provides, in relevant part,
   (a) The court shall grant the debtor a discharge ...
   (b) Except as provided in section 523 of this title, a discharge under subsection (a) of this section discharges the debtor from all debts that arose before the date of the order for relief under this chapter ...
   11 U.S.C. § 727(a), (b).

3. As will be discussed more fully below, § 523(a)(8) excepts student loans from a Chapter 7 discharge, unless the debtor can demonstrate that repayment will impose "undue hardship" on the debtor and his or her dependents. A debtor seeking to have his or her student loans discharged must commence an adversary proceeding against the holder of the loans. Fed. R. Bankr.P. 7001(6).

4. Although the complaint initially named Sallie Mae as the defendant, ECMC was substituted as defendant, as ECMC is the current holder of the Rebecca Hicks' student loans.

dictable and dissimilar results in cases presenting similar facts," because "in the absence of such guidance, courts in this Circuit will continue to be faced with a variety of 'undue hardship' tests that can be adopted on an ad hoc basis or even hybridized." Furthermore, ECMC argues that the *Brunner* test represents the proper legal standard because it is understandable and workable, facilitates appellate review and advances the congressional policies underlying § 523(a)(8).

## B. Discussion

### 1. *Section 523(a)(8) and "Undue Hardship"*

■ A debtor under Chapter 7 of the Bankruptcy Code is generally entitled to a discharge of all debts that arose before the filing of the bankruptcy petition. *See* 11 U.S.C. § 727(a), (b). Student loans, however, are excepted from this general discharge and, without more, a debtor will emerge from bankruptcy with the continued obligation to repay his or her student loans. *See* 11 U.S.C. § 523(a)(8). There is, of course, an exception to the exception. Under § 523(a)(8), student loans are excepted from discharge "*unless* excepting such debt from discharge ... *will impose an undue hardship* on the debtor and the debtor's dependents." (emphasis added).[5]

■ The Bankruptcy Code was amended to provide this special treatment for student loans in reaction to perceived abuses of the bankruptcy discharge— namely, that recent college graduates were filing for bankruptcy to rid themselves of student loan obligations "on the eve of a lucrative career." *Andresen v. Neb. Student Loan Program, Inc. (In re Andresen),* 232 B.R. 127, 130 (8th Cir. BAP 1999). Congress' purpose in excepting student loans from the general bankruptcy discharge provisions was "to 'rescu[e] the student loan program from insolvency, and [to] prevent[ ] abuse of the bankruptcy process by undeserving student debtors.' " *Id.* (quoting Raymond L. Woodcock, *Burden of Proof, Undue Hardship, and Other Arguments for the Student Loan Debtor Under 11 U.S.C. § 523(a)(8)(B),* J.C. & U.L. 377, 381 (1998)); *see also Educ. Credit Mgmt. Corp. v. Polleys,* 356 F.3d 1302, 1306–07 (10th Cir.2004); *Cheesman v. Tenn. Student Assistance Corp. (In re Cheesman),* 25 F.3d 356, 359 (6th Cir. 1994), *cert. denied,* 513 U.S. 1081, 115 S.Ct. 731, 130 L.Ed.2d 634 (1995); *Brunner v. N.Y. State Higher Educ. Servs. (In re Brunner),* 46 B.R. 752, 754 (S.D.N.Y.1985), *aff'd* 831 F.2d 395 (2d Cir.1987).

As to when the exception to discharge should *not* apply, however, Congress has been less than clear.[6] The phrase "undue

---

5. Section 523 provides, in pertinent part:

(a) A discharge under section 727 ... does not discharge an individual debtor from any debt—

...

(8) for an educational benefit overpayment or loan made, insured or guaranteed by a governmental unit, or made under any program funded in whole or in part by a governmental unit or nonprofit institution, or for an obligation to repay funds received as an educational benefit, scholarship or stipend, unless excepting such debt from discharge under this paragraph will impose an undue hardship on the debtor and the debtor's dependents

...

11 U.S.C. § 523(a)(8). It is undisputed that the loans at issue in this case are subject to § 523(a)(8), as ECMC is a nonprofit "student loan guarantor agency and was created under the direction of the U.S. Department of Education to provide specialized guarantor services to the Department of Education pursuant to the Federal Family Loan Program ...." Answer of the Defendant ¶ 4.

6. It is interesting to note that Congress did not take the opportunity to provide greater clarity in its most recent amendments to the

hardship" is not defined in the Bankruptcy Code, and the Congressional record provides little guidance as to what constitutes undue hardship under § 523(a)(8). *See Nash v. Conn. Student Loan Found.*, 330 B.R. 323, 324, 2005 WL 2033372, *2 (D.Mass. August 17, 2005); *Kopf,* 245 B.R. at 736 n. 10, 743 n. 20 (reviewing the scant legislative history of § 523(a)(8) and describing indices of "legislative intent" relied on by other courts); *In re Brunner,* 46 B.R. at 753–54. Although several courts have formulated or adopted legal standards to guide the determination of whether a debtor has established undue hardship, *see, e.g., Bryant v. Pa. Higher Educ. Assistance Agency (In re Bryant),* 72 B.R. 913 (Bankr.E.D.Pa.1987) (creating the "*Bryant* Poverty Level Test"); *Brunner v. N.Y. Higher Educ. Servs. Corp.*, 831 F.2d 395 (2d Cir.1987) (adopting the District Court's test in 46 B.R. 752, now known as the "*Brunner* test"); *Andrews v. S.D. Student Loan Assistance Corp. (In re Andrews),* 661 F.2d 702 (8th Cir.1981) (articulating the framework for a "totality of the circumstances" test); *Pa. Higher Educ. Assistance Agency v. Johnson (In re Johnson),* 5 B.C.D. 532 (Bankr.E.D.Pa. 1979) (creating the "*Johnson* test"), the First Circuit has not yet adopted any particular test to be used to evaluate the dischargeability of student loans under § 523(a)(8)(B).[7] *Nash,* 330 B.R. at 325 n.

1; *Smith v. Educ. Credit Mgmt. Corp. (In re Smith),* 328 B.R. 605, 610–12 (1st Cir. BAP 2005).

Currently, the jurisprudential landscape is dominated by two tests, the "totality of the circumstances" test and the *Brunner* test,[8] between which this Court is asked to choose and to which it now turns.

### 2. The Tests

#### a. The Totality of the Circumstances Approach

The totality of the circumstances approach to determining undue hardship under § 523(a)(8) is often associated with two cases from the Eighth Circuit, *Andrews v. South Dakota Student Loan Assistance Corp. (In re Andrews),* 661 F.2d 702 (8th Cir.1981), and *Andresen v. Nebraska Student Loan Program, Inc. (In re Andresen),* 232 B.R. 127. *See also Long v. Educ. Credit Mgmt. Corp. (In re Long),* 322 F.3d 549, 553 (8th Cir.2003) ("reaffirm[ing] the totality-of-the-circumstances approach as set forth in *Andrews* ...."). Courts in other jurisdictions, including several in the First Circuit, also analyze undue hardship using the totality of the circumstances approach. *See Kopf,* 245 B.R. at 739–40 & n. 16 (collecting cases); *see also Bourque v. Educ. Credit Mgmt. Corp. (In re Bourque),* 303 B.R. 548, 550 (Bankr.D.Mass. 2003); *Lamanna v. EFS Servs., Inc. (In re*

---

Bankruptcy Code. The term "undue hardship" remains, without further explanation. *See* Bankruptcy Abuse Prevention and Consumer Protection Act of 2005, 109 P.L. 8, § 220, 119 Stat. 23 (to be codified at 11 U.S.C. § 523(a)(8)).

7. The most extensive commentary by the First Circuit Court of Appeals regarding undue hardship under § 523(a)(8) is found in *dicta* in *T I Fed. Credit Union v. DelBonis,* where the court provided a brief overview of the section in deciding that federal credit unions are "government units" under § 523(a)(8). 72 F.3d 921, 927, 935–38 (1st Cir.1995).

8. As alluded to above, at least two other tests, the *Johnson* test and the *Bryant* test, have garnered some support in the case law. *See generally,* Thad Collins, *Forging Middle Ground: Revision of Student Loan Debts in Bankruptcy as an Impetus to Amend 11 U.S.C. § 523(a)(8),* 75 Iowa L.Rev. 733 (1990) (describing various tests for undue hardship and providing numerous citations to relevant case law and academic articles). It appears from the current case law, however, that courts have mostly adopted either the *Brunner* test or the "totality of the circumstances" test.

*Lamanna),* 285 B.R. 347, 353 (Bankr. D.R.I.2002); *Anelli v. Sallie Mae Serv. Corp. (In re Anelli),* 262 B.R. 1, 8–9 (Bankr.D.Mass.2000).[9]

▉▉ Under the totality of the circumstances approach, courts generally define undue hardship as the debtor's inability "to earn sufficient income to maintain himself (or herself) and his (or her) dependents and to repay the educational debt." *In re Andresen,* 232 B.R. at 140 n. 12; *see also In re Smith,* 328 B.R. at 610–13; *Bourque,* 303 B.R. at 550; *Mallinckrodt v. Chem. Bank (In re Mallinckrodt),* 260 B.R. 892, 898, 900 (Bankr.S.D.Fla.2001). To determine whether the debtor has demonstrated undue hardship, courts adhering to the totality of the circumstances approach generally consider:

1. the debtor's past, present, and reasonably reliable future financial resources;

2. a calculation of the debtor's and his dependents' reasonable necessary living expenses; and

3. *any other relevant facts and circumstances surrounding that particular bankruptcy case.*

*In re Andresen,* 232 B.R. at 139 (emphasis added); *see also Educ. Credit Mgmt. Corp. v. Savage (In re Savage),* 311 B.R. 835, 839 (1st Cir. BAP 2004); *Kopf,* 245 B.R. at 739, 745–47.

Courts that have adopted the totality of the circumstances approach to undue hardship usually do so on the grounds that a " 'case-by-case approach that is fact sensitive' ... 'affords a determination that contextually considers both the debtor's situation and the policies underlying § 523(a)(8)' and 'ensures an appropriate, equitable balance [between] concern for cases involving extreme abuse and concern for the overall fresh start policy.' " *Phelps v. Sallie Mae Loan Serv. Center (In re Phelps),* 237 B.R. 527, 534–35 (Bankr. D.R.I.1999) (quoting *Law v. Educ. Res. Inst., Inc. (In re Law),* 159 B.R. 287, 292–93 (Bankr.D.S.D.1993)); *see also In re Savage,* 311 B.R. at 839; *In re Andresen,* 232 B.R. at 140; *Crowley v. U.S. Dep't of Educ. (In re Crowley),* 259 B.R. 361, 365 (Bankr.W.D.Mo.2001). And the Eighth Circuit recently stated in reaffirming its adherence to the totality of the circumstances approach,

> We are convinced that requiring our bankruptcy courts to adhere to the strict parameters of a particular test would diminish the inherent discretion contained in § 523(a)(8)(B).... We believe that fairness and equity require each undue hardship case to be examined on the unique facts and circumstances that surround the particular bankruptcy.

*In re Long,* 322 F.3d at 554.

b.  *The* Brunner *Approach*

The test articulated by the District court in *Brunner v. New York State Higher Education Services (In re Brunner),* 46 B.R. 752 (S.D.N.Y.1985), and adopted by the Second Circuit Court of Appeals, *see* 831 F.2d 395 (2d Cir.1987), is now used for determining undue hardship under § 523(a)(8) in a majority of circuits. *See, e.g., Oyler v. Educ. Credit Mgmt. Corp. (In re Oyler),* 397 F.3d 382 (6th Cir.2005); *Educ. Credit Mgmt. Corp. v. Polleys,* 356 F.3d 1302 (10th Cir.2004); *Hemar Ins. Corp. v. Cox (In re Cox),* 338 F.3d 1238 (11th Cir.2003); *U.S. Dep't of Educ. v. Gerhardt (In the Matter of Gerhardt),* 348

---

**9.** Some courts in the First Circuit, however, have adopted the *Brunner* test. *See, e.g., Grigas v. Sallie Mae Serv. Corp. (In re Grigas),* 252 B.R. 866, 874 (Bankr.D.N.H.2000); *Gar-* *rett v. N.H. Higher Educ. Assistance Found. (In re Garrett),* 180 B.R. 358, 362 (Bankr. D.N.H.1995).

F.3d 89 (5th Cir.2003); *United Student Aid Funds, Inc. v. Pena (In re Pena)*, 155 F.3d 1108 (9th Cir.1998); *Pa. Higher Educ. Assistance Agency v. Faish (In re Faish)*, 72 F.3d 298 (3d Cir.1995); *In re Roberson*, 999 F.2d 1132 (7th Cir.1993).

The *Brunner* test follows an essentially linear analysis and asks whether the debtor has demonstrated that:

1. the debtor cannot maintain, based on current income and expenses, a "minimal" standard of living for herself and her dependents if forced to repay the loans;

2. additional circumstances exist indicating that this state of affairs is likely to persist for a significant portion of the repayment period of the student loans; and

3. the debtor has made good faith efforts to repay the loans.

*Brunner*, 831 F.2d at 396. Each prong must be satisfied before the court proceeds to the next; if any part of the test is not satisfied, the inquiry ends, *Rifino v. United States (In re Rifino)*, 245 F.3d 1083, 1088 (9th Cir.2001) (quoting *In re Faish*, 72 F.3d at 306), and the student loans at issue are not dischargeable (or, more precisely, they remain excepted from the debtor's general discharge).

Courts that have adopted the *Brunner* approach to undue hardship under § 523(a)(8) have generally done so because, they maintain, it provides a workable, easily articulated framework for courts and parties to follow while still allowing for a fact- and case-sensitive determination. *See. e.g., In re Oyler*, 397 F.3d at 385; *Polleys*, 356 F.3d at 1309; *Gerhardt*, 348 F.3d at 91; *In re Faish*, 72 F.3d at 306. The *Brunner* framework is also widely seen as advancing the policies behind § 523(a)(8). *See. e.g., In re Cox*, 338 F.3d at 1242; *O'Hearn v. Educ. Credit Mgmt. Corp. (In the Matter of O'Hearn)*, 339 F.3d 559, 564 (7th Cir.2003); *In re Faish*, 72 F.3d at 305–6; *Roberson*, 999 F.2d at 1135–36.

Finally, many courts claim that adopting the *Brunner* test will "create[ ] more certainty and predictability by establishing concrete factors." *In re Grigas*, 252 B.R. at 874 n. 8; *see also In re Oyler*, 397 F.3d at 385 (adopting the *Brunner* standard because it is a "simpler rubric" and "easily accommodates factors [the court] looks to in evaluating undue hardship"); *Polleys*, 356 F.3d at 1309 (stating that the "lists of factors that should be considered" under the totality of the circumstances test " 'flunk[s] the test of utility' ") (quoting *In re Plunkett*, 82 F.3d 738, 741 (7th Cir. 1996)). And although not all courts are quite so candid, it is likely that many have chosen to specifically adopt the *Brunner* framework in order to "create[ ] more uniformity within [their respective] district[s] in an effort to foster predictability and avoid the unseemliness that flows from outcomes being dependent upon the random assignment of a case to a judge." *In re Grigas*, 252 B.R. at 874 n. 8.

### 3. *Analysis*

As a starting point for the undue hardship analysis under § 523(a)(8), courts applying either the totality of the circumstances or the *Brunner* test usually look to the 1973 Report of the Commission on the Bankruptcy Laws of the United States, which provides a general guideline for the inquiry:

[Student loans] should not be dischargeable as a matter of policy before [the debtor] has demonstrated that for any reason he is unable to earn sufficient income to maintain himself and his dependents and to repay the educational debt.

In order to determine whether nondischargeability of the debt will impose an "undue hardship" on the debtor, the rate and amount of his future resources should be estimated reasonably in terms of ability to obtain, retain, and continue employment and the rate of pay that can be expected. Any unearned income or other wealth which the debtor can be expected to receive should also be taken into account. The total amount of income, its reliability, and the periodicity of its receipt *should be adequate to maintain the debtor and his dependents at a minimal standard of living within their management capability, as well as to pay the educational debt.*

*Communication from the Executive Director, Commission on The Bankruptcy laws of the United States, Transmitting a Report of the Commission on the Bankruptcy laws of the United States,* H.R. Doc. No. 93–137, 93d Cong., 1st Sess., Pt. II, p. 140 n. 15, p. 140–41, n.17 (1973) (the "Bankruptcy Commission Report") (emphasis added).[10] In analyzing the "minimal standard of living" question, courts applying either test do not consider the debtor's current income and expenses unchangeable; instead, courts focus on whether the debtor has maximized his or her income potential and has minimized expenses to include only "reasonably necessary expenses." *Smith v. Educ. Credit Mgmt. Corp. (In re Smith),* 328 B.R. 605,

613–14 (1st Cir. BAP 2005); *see also Long v. Educ. Credit Mgmt. Corp. (In re Long),* 322 F.3d 549, 554–55 (8th Cir.2003).

As one court has recently commented: "Distilled to its essence, the court must examine the debtor's current income and expenses and determine a 'flexible minimal standard of living' which is sensitive to the particular circumstances of each case through the application of common sense."

*Kopf,* 245 B.R. at 740 (quoting *Salinas v. United Student Aid Funds, Inc. (In re Salinas),* 240 B.R. 305, 314 (Bankr. W.D.Wis.1999); *Stein v. Bank of N. Eng. (In re Stein),* 218 B.R. 281, 287 (Bankr. D.Conn.1998)).

At this point, however, the two tests diverge in form, if not always in function. While under the totality of the circumstances approach, the court may also consider "any additional facts and circumstances unique to the case" that are relevant to the central inquiry (i.e., the debtor's ability to maintain a minimum standard of living while repaying the loans), the *Brunner* test imposes two additional requirements on the debtor that *must* be met if the student loans are to be discharged.

■ In *Kopf v. United States Department of Education (In re Kopf),* Judge Haines thoroughly reviewed the predominant tests under § 523(a)(8), including the

---

10. *See, e.g., Polleys,* 356 F.3d at 1309–10 (adopting *Brunner* test) (requiring a showing "that the debtor cannot maintain a minimal standard of living while repaying the student loan debt ... comports with the legislative policy behind § 523(a)(8) ...."); *In re Roberson,* 999 F.2d at 1135 (adopting *Brunner* test) ("an examination into the debtor's ability to maintain a minimal standard of living ... should serve as the starting point for the § 523(a)(8)(B) analysis ...."); *In re Andrews,* 661 F.2d at 704 (using totality of the circumstances approach) ("[t]he bankruptcy court must determine whether there would be anything left from debtor's estimated future income to enable the debtor to make some payment on his/her student loan without reducing what the debtor and his/her dependents need to maintain a minimal standard of living"); *In re Brunner,* 46 B.R. at 755 ("before receiving a discharge of student loans the debtor is required to demonstrate that, given his or her current income and expenses, the necessity of making the monthly loan payment will cause his or her standard of living to fall below a 'minimal' level.").

totality of the circumstances test and the *Brunner* test, before concluding that the totality of the circumstances test represented the best approach for determining whether a debtor has established undue hardship.[11]  245 B.R. 731 (Bankr.D.Me. 2000).  An analysis of the second and third parts of the *Brunner* test leads this Court to agree with Judge Haines that the *Brunner* test "test[s] too much."

At first blush, the second *Brunner* requirement—a showing that the debtor's "state of affairs is likely to persist for a significant portion of the repayment period of the student loan"—seems merely to resonate with the forward-looking nature of the undue hardship analysis.  That is, under *any* undue hardship standard the debtor must show that the inability to maintain a minimum standard of living while repaying the student loans is not a temporary reality, but will continue into the foreseeable future.

Many courts interpreting and applying the second *Brunner* prong, however, place dispositive weight on the debtor's ability to demonstrate "additional extraordinary circumstances" that establish a "certainty of hopelessness."[12]  This has led some courts to require that the debtor show the existence of "unique" or "extraordinary" circumstances, such as the debtor's advanced age, illness or disability, psychiatric problems, lack of usable job skills, large number of dependents or severely limited education.  *See, e.g., Oyler v. Educ. Credit Mgmt. Corp. (In re Oyler)*, 397 F.3d 382, 386 (6th Cir.2005); *United States Dep't of Educ. v. Gerhardt (In re Gerhardt)*, 348 F.3d 89, 92 (5th Cir.2003); *In re Brunner*, 46 B.R. at 755.  And, in the absence of such a showing, the court may conclude that the debtor has failed the second *Brunner* prong and the student loans will not be discharged.  *See. e.g., Healey v. Mass. Higher Educ. (In re Healey)*, 161 B.R. 389, 395–96 (E.D.Mich.1993) (stressing that the debtor is required to show *additional circumstances* and emphasizing that the debtor was not disabled, had no dependents, was not ill or elderly and was mentally competent).

---

**11.**  Judge Haines also examined, and rejected, the *Johnson* test, as articulated in *Pennsylvania Higher Education Assistance Agency v. Johnson (In re Johnson)*, 5 B.C.D. 532 (Bankr. E.D.Pa.1979).  This test no longer appears to be prominent.  In fact, the Third Circuit Court of Appeals has expressly adopted the *Brunner* test for that circuit, *see Pa. Higher Educ. Assistance Agency v. Faish (In re Faish)*, 72 F.3d 298 (3d Cir.1995).  For this reason, and because neither party advocates adoption of the *Johnson* test, this Court will not consider it here.

**12.**  The notion that "dischargeability of student loans should be based upon the certainty of hopelessness" is drawn from *Briscoe v. Bank of N.Y. (In re Briscoe)*, 16 B.R. 128, 131 (Bankr.S.D.N.Y.1981), cited by the District Court in *Brunner*.  *See* 46 B.R. at 755.  Relying on this passage, some courts seem to brush over the actual text of § 523(a)(8)— requiring only that the debtor show nondischargeability "will result in undue hardship"—which connotes little more than that the debtor demonstrate a long-term situation. Instead, by focusing on the "certainty of hopelessness," language, it appears that any room for optimism will result in a finding of nondischargeability.  For courts citing the "certainty of hopelessness" standard, *see Oyler*, 397 F.3d at 386; *Roberson*, 999 F.2d at 1136; *see also Garrett v. N.H. Higher Educ. Assistance Found. (In re Garrett)*, 180 B.R. 358, 363 (Bankr.D.N.H.1995) ("An undue hardship discharge should only be granted to debtors 'severely disadvantaged economically as a result of unique factors which are so much a part of the bankrupt's life, present and in the foreseeable future, that the expectation of repayment is virtually non-existent, unless by that effort the bankrupt strips himself of all that makes life worth living.' ") (quoting *Courtney v. Gainer Bank (In re Courtney)*, 79 B.R. 1004, 1010 (Bankr.N.D.Ind. 1987)); *N.Y. State Higher Educ. Servs. Corp. v. Kohn (In re Kohn)*, 5 B.C.D. 419, 424 (Bankr. S.D.N.Y.1979).

Requiring the debtor to present additional evidence of "unique" or "extraordinary" circumstances amounting to a "certainty of hopelessness" is not supported by the text of § 623(a)(8). The debtor need only demonstrate "undue hardship." True, the debtor must be able to prove that the claimed hardship is more than present financial difficulty. *See Kopf,* 245 B.R. at 742, 745. And the existence of any of the factors mentioned above may be highly relevant to a finding that the hardship will persist into the foreseeable future. But whether or not this Court subjectively views the debtor's circumstances as "unique" or "extraordinary" is, in a word, overkill. The Court should concern itself with taking a

> realistic look ... into [the] debtor's circumstances and the debtor's ability to provide for adequate shelter, nutrition, health care, and the like. Importantly, 'the [C]ourt[ ] should base [its] estimation of a debtor's prospects on specific articulable facts, not unfounded opti-

mism,' and the inquiry into future circumstances should be limited to the foreseeable future.

*Polleys,* 356 F.3d at 1310 (quoting Robert F. Salvin, *Student Loans, Bankruptcy, and the Fresh Start Policy: Must Debtors Be Impoverished to Discharge Educational Loans?,* 71 Tul. L.Rev. 139, 197 (1996)). Requiring something more stretches the text of § 523(a)(8) beyond its logical bounds.[13]

As to the third part of the *Brunner* test, this Court agrees with Judge Haines that the "good faith" requirement is "without textual foundation." *Kopf,* 245 B.R. at 741. Under the good faith prong of the *Brunner* test, courts often consider the debtor's pre-bankruptcy behavior—they look at whether the debtor has made efforts to repay his or her student loans or has attempted to negotiate with the holder of the loans to obtain forbearances, deferments or reduced payments.[14]

**13.** Of course, the debtor must be able to show something more than "garden-variety" hardship, *Kopf,* 245 B.R. at 743, 744, but the fact that the debtor must present evidence showing that the inability to pay is more than general financial difficulty and will persist into the future is already contemplated by the structure of the Code and by the text of § 523(a)(8). *See Kopf,* 245 B.R. at 744. Because student loans are not part of the general discharge provisions of the Bankruptcy Code, and because § 523(a)(8) requires a showing that the exception from discharge *"will* impose" undue hardship, there is no need, indeed there is no basis, for the Court to construct additional evidentiary requirements under § 523(a)(8).

There are many reasons why a debtor may find himself or herself unable to make student loan payments while maintaining a minimal standard of living. There are times when the interplay of seemingly mundane factors exacerbates the debtor's unfortunate financial situation in subtle, yet devastating, ways. In such cases, it may well be that there is no foreseeable ability to adequately provide for the household while paying off student loans,

even though it is difficult to pinpoint a "unique" or "extraordinary" factor as the cause.

This is not to say, however, that a debtor seeking discharge of student loans carries an easy burden. The evidentiary record must be sufficient to show that the hardship truly is long-term. "But that does not mean that debtors will fail in most attempts to prove undue hardship. Whether or not they succeed is a function of the facts of each case ... as they measure up against the undue hardship standard." *Kopf,* 245 B.R. at 744 n. 23.

**14.** *See, e.g., Educ. Credit Mgmt. Corp. v. Boykin (In re Boykin),* 313 B.R. 516, 523 (M.D.Ga. 2004) ("[F]ailure to diligently pursue repayment options is a factor properly to be considered in applying *Brunner's* good faith requirement."); *Mason v. Help Servs. Group, Inc. (In re Mason),* 303 B.R. 459, 467 (Bankr.D.Idaho 2004), *aff'd,* 315 B.R. 554 (9th Cir. BAP 2004) (Under the good faith prong, "[c]onsideration is also placed on a debtor's efforts to deal with repaying student loans, be that through making payments, seeking deferments when unable to pay, or negotiating manageable re-

Consistent with Judge Haines' opinion, one court recently examined the propriety of the "good faith" requirement and concluded that

Regardless of whether the legislative history supports the consideration of the debtor's past good faith efforts to repay in determining undue hardship, though, such a consideration is not supported in the plain language of the statute; in fact, we find that the express language of the statute actually precludes such a consideration.

*Crowley v. U.S. Dep't of Educ. (In re Crowley)*, 259 B.R. 361, 367 (Bankr. W.D.Mo.2001); *see also Kopf*, 245 B.R. at 741 n. 19. This Court agrees with that observation. First, as the court in *Crowley* noted, the statute's use of the phrase " 'will impose' unambiguously indicates that the focus of the inquiry is with the *future* impact of excepting the debt from discharge." *Crowley*, 259 B.R. at 368 (em-

phasis added). The debtor's past behavior does not inform this inquiry—"the impact [of excepting the student loans from discharge] will be the same whether or not the debtor made good faith efforts to repay the debt," *id.; see also Kopf*, 245 B.R. at 741 ("there is no need to apply separately-constituted 'good faith' or 'policy' tests"); *Daugherty v. First Tenn. Bank (In re Daugherty)*, 175 B.R. 953, 960 (Bankr.E.D.Tenn.1994) ("the statutory language [of § 523(a)(8)] requires an 'undue hardship,' not good faith.").

In addition, the undue hardship inquiry requires the court not only to look at the debtor's individual circumstances, but to consider the effect of the § 523(a)(8) exception on the debtor's dependents. The *Crowley* court rightly noted that considering the debtor's past conduct in an undue hardship analysis is "illogical and inconsistent with the statute. . . . To do so would be, in effect, visiting the sins of the father

payment terms."); *Wilson v. Educ. Credit Mgmt. Corp. (In re Wilson)*, 2002 WL 32155401, *4 (Bankr.E.D.Va.2002) ("Good faith effort also requires 'the debtor to have made payments when he or she was in a position to make such payments.' ") (quoting *Lohr v. Mae (In re Lohr)*, 252 B.R. 84, 89 (Bankr.E.D.Va.2000)); *Alderete v. Colo. Student Loan Program (In re Alderete)*, 289 B.R. 410, 419–20 (Bankr.D.N.M.2002), *rev'd on other grounds*, 412 F.3d 1200 (10th Cir.2005) ("Whether the Debtors have made any efforts to negotiate repayment options is 'an important indicator of good faith' . . . [and] whether a debtor is willing to participate in a repayment program is a relevant factor.") (quoting *In re Wallace*, 259 B.R. 170, 185 (C.D.Cal. 2000)); *Barron v. Tex. Guaranteed Student Loan Corp. (In re Barron)*, 264 B.R. 833, 842 (Bankr.E.D.Tex.2001) ("Factors to be considered include the number of payments the debtor made, attempts to negotiate with the lender, proportion of loans to total debt, and possible abuse of the bankruptcy system."); *Lehman v. N.Y. Higher Educ. Servs. Corp. (In re Lehman)*, 226 B.R. 805, 809 (Bankr.D.Vt. 1998) ("Debtor has certainly had opportunities to repay some amount, yet did not. . . .

Such conduct cannot satisfy the good faith requirement of the Brunner test."); *Garrett v. N.H. Educ. Assistance Found. (In re Garrett)*, 180 B.R. 358, 364 (Bankr.D.N.H.1995) (finding substantial evidence of lack of good faith where debtor requested and obtained deferments but made no payments and had not attempted to enter into a repayment schedule); *Maulin v. Salliemae (In re Maulin)*, 190 B.R. 153, 156 (Bankr.W.D.N.Y.1995) (where debtor cannot repay loans and maintain a minimal standard of living, "the demonstration of good faith does not necessarily command a history of payment. It does require a history of effort to achieve repayment . . . . Relevant proof may . . . include a history of some payment, the propitious use of deferments and the energetic exploration of employment options."); *Sands v. United Student Aid Funds (In the Matter of Sands)*, 166 B.R. 299, 311–312 (Bankr.W.D.Mich.1994) ("In determining the Debtor's good faith, the court must not only examine the Debtor's payments towards his student loans, but also his efforts to negotiate deferments with the applicable student loan agency . . . . in addition, the timing of the Debtor's bankruptcy filing may affect the good faith analysis.").

(or mother) upon the children—a result contrary to the letter of the statute and the spirit of the law." *Id.; see also Kopf,* 245 B.R. at 741–42. And this Court agrees with the *Crowley* court that "[i]f Congress had intended a bankruptcy court to base its determination of a student loan debt on the debtor's past conduct, it could have said so." 259 B.R. at 368. Because it did not, and because the plain language of the statute is forward-looking only, this Court concludes that the "good faith" requirement under *Brunner* is not supported by the text of § 523(a)(8) and should not be part of the undue hardship analysis.

In addition to the reasons stated by the court in *Crowley* and by Judge Haines in his comprehensive analysis in *Kopf,* this Court notes also that the passage of time has demonstrated that the purported benefits of the *Brunner* test have not come to pass. Instead of the clarity, uniformity in analysis and continuity between circuits touted by ECMC, adoption of the *Brunner* test by a majority of the circuits has only given the illusion of consistency despite actual differences in its substance and application.

A recent case from the Eleventh Circuit has called attention to substantive variations in the *Brunner* test as applied by different courts and different circuits. In *Educational Credit Management Corp. v. Boykin (In re Boykin),* the court found that the *Brunner* test as adopted by the Eleventh Circuit does not include the same considerations as the *Brunner* test adopted by the Tenth Circuit in *Polleys,* 313 B.R. 516 (M.D.Ga.2004). Although both the Tenth and Eleventh Circuits appeared to adopt identical versions of the

*Brunner* test, *see Polleys,* 356 F.3d at 1307, 1309; *Hemar Ins. Corp. of Am. v. Cox (In re Cox),* 338 F.3d 1238, 1241–42 (11th Cir.2003), the district court in *Boykin* held that the bankruptcy court's

> reliance on *Polleys* [was] misplaced. While it may be true that *In re Cox* does not provide a step-by-step roadmap for applying each prong of the *Brunner* test, it does set forth clear principles regarding both its application and the purposes it is intended to serve. In *Polleys* the Tenth Circuit adopted the *Brunner* framework, but in applying its standards, the court deviates significantly from the principles set forth by the Eleventh Circuit in *In re Cox.*
>
> ... Eleventh Circuit precedent, by which this Court is bound, takes a different stand on student loan dischargeability. The Court will now apply the *Brunner* test, as adopted by the Eleventh Circuit ....

*In re Boykin,* 313 B.R. at 520–21. Thus, even though *Brunner* has only recently achieved such prominence, there are already "different" *Brunner* tests. This Court is left to wonder, if it were to decide to adopt the *Brunner* framework, *which* Brunner *test* to adopt or whether to craft its own.

As a more subtle example of differences in courts' application of the *Brunner* test, this Court notes that the factors to be considered under each *Brunner* prong are inconsistent among the courts. For example, some courts view the question of whether a debtor has made efforts to maximize income and minimize expenses as relevant to the first *Brunner* prong,[15]

---

15. *See, e.g., In re Rifino,* 245 F.3d at 1088 (examining debtor's income and the reasonableness of her expenses under the first *Brunner* prong); *In re Faish,* 72 F.3d at 307 (holding that debtor failed the first *Brunner* prong

because she did not demonstrate that she had maximized earnings and minimized expenses); *Ammirati v. Nellie Mae, Inc. (In re Ammirati),* 187 B.R. 902, 906–7 (D.S.C.1995) (examining debtor's efforts to maximize in-

some as relevant to the second *Brunner* prong [16] and others as relevant to the third, "good faith," *Brunner* prong.[17]

Arguably, the impact of this latter example is slight, given that inquiry into a debtor's maximization of income and minimization of expenses remains a central focus of the court's inquiry, regardless of which part of the test it falls under. But this type of variation undercuts the utility of adopting *Brunner* to provide a consistent, workable and uniform framework for § 523(a)(8) analyses.

■ For all these reasons, this Court views the best approach as one that focuses on one simple question: **Can the debtor now, and in the foreseeable future, maintain a reasonable, minimal standard of living for the debtor and the debtor's dependents and still afford to make payments on the debtor's student loans?** In answering this question, the Court should consider all relevant evidence—the debtor's income and expenses, the debtor's health, age, education, number of dependents and other personal or family circumstances, the amount of the monthly payment required, the impact of the general discharge under chapter 7 and the debtor's ability to find a higher-paying job.

move or cut living expenses. In addition, other factors not listed here may impact a particular debtor's case.

This "laundry list" of considerations does not suggest that focusing on the totality of the circumstances is purely an ad hoc, willy-nilly approach to undue hardship under § 523(a)(8). *See, e.g., Nash v. Conn. Student Loan Found.,* 330 B.R. 323, 326, 2005 WL 2033372, *3 (D.Mass. Aug. 17, 2005); *but see Polleys,* 356 F.3d at 1309. It does reflect the fact that the lives of all debtors are complex and each individual case is *entitled* to be evaluated in its context. Nor does such an approach present extraordinary difficulties. Rather, by focusing on the central question, as stated above, the relevance of any particular factor should be clear; if a particular factor helps answer that question, it should be given appropriate weight and, as Judge Haines put it, "if a factor cannot be taken account of in a principled undue hardship assessment, it should not be considered a material factor at all." *Kopf,* 245 B.R. at 741.

This Court agrees with ECMC that a single articulated standard adopted in all circuits would benefit both courts and parties in approaching § 523(a)(8) discharge-

---

come and minimize expenses under first *Brunner* prong); *Sands,* 166 B.R. at 306–7 (the first part of *Brunner* requires the court to "evaluate whether the Debtor has minimized his expenses and maximized his financial resources") (citing *In re Healey,* 161 B.R. at 394).

16. *See, e.g., In re Oyler,* 397 F.3d at 385 (although a debtor's minimization of expenses is considered under the first prong, "a debtor's attempt to maximize income ... [is] the controlling aspect of *Brunner's* second prong.") (citing *Storey v. Nat'l Enter. Sys. (In re Storey),* 312 B.R. 867, 872 (Bankr.N.D.Ohio 2004)).

17. *See, e.g., Polleys,* 356 F.3d at 1312 ("the good faith part can be satisfied by a showing that ... [the debtor] is actively minimizing current household living expenses and max-

imizing personal and professional resources"); *In re O'Hearn,* 339 F.3d at 564 ("The third prong, good faith, is measured by the debtor's 'efforts to obtain employment, maximize income, and minimize expenses ...'") (quoting *In re Roberson,* 999 F.2d 1132, 1135 (7th Cir.1993)); *Educ. Credit Mgmt. Corp. v. Mason (In re Mason),* 315 B.R. 554, 563 (9th Cir. BAP 2004) (factors to be considered as part of good faith include the debtor's efforts "to obtain employment, maximize income, and minimize expenses"); *Stebbins–Hopf v. Tex. Guaranteed Student Loan Corp. (In re Stebbins–Hopf),* 176 B.R. 784, 786–87 (Bankr.W.D.Tex.1994) (determining good faith requires the court to "consider whether the debtor has made an effort to maximize her income and minimize her expenses.").

ability determinations. Congress, however, has chosen not to establish a definitive standard to govern the undue hardship inquiry, and this Court declines to adopt the *Brunner* test on grounds of expediency alone. This Court is persuaded that the totality of the circumstances approach best effectuates congressional policy while adhering to the plain text of § 523(a)(8).

## III. *DISCHARGEABILITY OF REBECCA HICKS' STUDENT LOANS*

### A. Findings of Fact

A trial on the dischargeability of Rebecca Hicks' student loans was held on January 14, 2005. Two witnesses testified for Ms. Hicks—Dr. Peter Riskind, a neurologist, and Rebecca Hicks; no witnesses were presented on behalf of ECMC. The parties submitted, without objection, a total of ten exhibits. The following facts are drawn from the witnesses' testimony, trial exhibits and filings in the Debtors' main bankruptcy case, of which this Court may take judicial notice. *See* Fed.R.Evid. 201, made applicable to this proceeding by Fed. R. Bankr.P. 9017. The facts are not materially disputed.

#### 1. *Personal and Family Circumstances*

The Debtors, along with their two young children (ages four and five) reside in a rural area of Western Massachusetts. Rebecca Hicks testified that their house was built in 1850 or 1860. She stated that the first floor roof leaks, the back roof is coming off and was, at the time of trial, covered with a tarp. Rebecca further expressed the Debtors' desire to repair the basement, which has a dirt floor, some broken windows and molded insulation.

At the time of trial, the Debtor's older child (the "Debtor's son") attended public, full-time kindergarten. He had recently been diagnosed with Tourette's Syndrome, a neurological disorder. Rebecca Hicks testified that he is in therapy with a psychologist, but did not state how often either she or her son meet with the psychologist.

The Debtors' younger child (the "Debtor's daughter"), was enrolled in a private pre-school program paid for by the Debtors. Rebecca Hicks testified that the Debtors' daughter was diagnosed with Lyme disease at the age of two; no evidence was presented that she currently requires medical care related to the disease. The Debtors' daughter has also been diagnosed with "central auditory processing disorder," a result of chronic ear infections. Although, according to Rebecca Hicks' testimony, the Debtors' daughter is speech and hearing delayed, she was receiving therapy with a speech pathologist twice a week at pre-school and was expected to attend public, full-time kindergarten in the Fall of 2005.

Rebecca Hicks was thirty-four years old at the time of trial. She has been diagnosed with Rheumatoid Arthritis. Early in January of 2001, Dr. Riskind also diagnosed her with multiple sclerosis ("MS") and, subsequently, a seizure disorder related to the MS and for which Rebecca currently receives treatment. According to Dr. Riskind's testimony, multiple sclerosis is generally a progressive illness, and may cause a variety of symptoms, including fatigue, loss of vision, double vision, uncoordination, weakness, cognitive difficulties and hearing problems. The disease presents differently among persons diagnosed with MS, however, and the trajectory of progression in any particular individual is "not absolutely predictable."

There is presently no cure for MS, although there are several drugs used to treat the symptoms of the disease and

which may slow its progression. Dr. Riskind testified that the effect of MS on life expectancy is debated in the literature, but any difference in life expectancy would be "fairly modest." Furthermore, studies that do show an impact on life expectancy show an impact on men suffering from the disease, but "do not suggest a definite reduction [of life expectancy] in women."

Persons with MS will often suffer from "attacks" which may last from days to months. Dr. Riskind testified that these attacks "differ greatly in individuals and also in the same individual over time." These "attacks" consist of a progressive development of neurologic dysfunction, followed by a "plateau" phase and then some degree of improvement. Persistent declines in neurologic function, however, are not reversible.

Dr. Riskind testified that Rebecca Hicks has suffered several "attacks" under his care, although the nature and extent of changes in her neurological function were not described. Although Dr. Riskind also testified at length regarding the possible symptoms and progression of MS generally, he offered few details regarding Rebecca Hicks' particular symptoms. Dr. Riskind did state that Rebecca suffers from "cognitive disturbances" which he described as "word-finding difficulty," "disturbances of vision" which cause difficulty reading and preclude driving at night, "some balance problems" and weight gain as a side effect of medications.

Dr. Riskind further testified that Rebecca Hicks could not work more than sixteen hours per week and would be unable to work a full eight-hour day. In June of 2003, Dr. Riskind had certified that he believed Rebecca Hicks to be permanently unable to work, but has since revised that assessment. In fact, Rebecca Hicks' testimony, as well as other admitted evidence, established that she works four days a week, four hours each day.

Rebecca Hicks' testimony regarding her "average day" is consistent with Dr. Riskind's testimony that persons with MS usually require more sleep and breaks during the day for resting. Rebecca testified that she spends between ten and twelve hours a day sleeping and resting, and uses her three-day weekend to "catch up on a lot of sleep." Aside from fatigue, Rebecca's only testimony regarding her other symptoms of the disease related to problems with her vision. She testified that she sometimes suffers from double vision, that her vision changes rapidly, and that she requires fairly frequent changes to her contact lens prescription.

Richard Hicks is 33 years old, in good health, and has worked full-time for the past five years as a network administrator for a bank in Connecticut. Although the bank is located approximately 35 miles from the Debtors' home, Rebecca Hicks' testimony was that Richard Hicks is available to help care for the children and the household before the children leave for school, in the evenings and on weekends.

### 2. Education and Work History

Rebecca Hicks graduated from the University of Massachusetts at Amherst in 1992 with a bachelor of arts degree. This education was paid for by her parents. She enrolled in Boston College's graduate school in 1994 and received a master's degree in social work in 1997. In order to finance her graduate education, Rebecca Hicks obtained the student loans at issue here. ECMC calculated the total amount due on those loans, as of January 10, 2005, to be $87,594.18, with a *per diem* of $9.07.

After obtaining her master's degree, Rebecca Hicks worked at McClain Hospital for a short period of time before securing employment with the Counsel on Aging,

where she worked as a discharge planner. After her diagnosis of MS, she worked for the Wing Memorial Hospital and as a medical social worker for the VNA. At that time she worked between 16 and 20 hours per week. In February of 2002, she began work at the Life Care Center in Wilbraham, and worked from 30 to 35 hours per week. She described her job there as "a lot more paperwork and a whole lot more running around." Her gross pay at that job was approximately $2,700 per month.

In September of 2003, Rebecca Hicks returned to the Wing Memorial Hospital as the primary social worker for the medical floor. Her job was modified to enable her to work four days a week, from 9 o'clock a.m. until 1 o'clock p.m. At the time of trial, Rebecca was earning $21.77 per hour. She testified that the job involves discharge planning and paperwork, and that her boss is present most of the time to help her. Paid sick time and "earned time" are accrued based on the number of hours worked.

### 3. Income

The Debtors' total household gross income for the past five years was as follows: in 2004—$95,221.58; in 2003—$92,242.00; in 2002—$94,412.00; in 2001—$73,111.76; and in 2000—$75,243.00.

According to a payroll history report entered into evidence, Rebecca Hicks' gross income for 2004 was $20,023.87 and her net income was $16,953.17, resulting in a monthly net income of approximately $1,413.00.

According to an earnings statement for the period ending on December 24, 2004, Richard Hicks' gross income for 2004 was $67,837.51. He also received one or more bonuses in the total amount of $7,360.20 for the year 2004. Thus, his total gross income for 2004 was $75,197.71. Not including the bonus, Richard Hicks' net income per month was $4,108.87. His anticipated monthly net income beginning January of 2005 is $4,075.33.[18]

Rebecca Hicks further testified that the Debtors received $1,644.00 in tax refunds in February 2004. There was no testimony regarding any anticipated tax refund for the 2004 tax year.

### 4. Expenses

The Debtors' monthly expenses are somewhat unclear, since the nature and amount of their expenses are reported and calculated differently on the Debtors' Schedule J (filed in the Debtors' main bankruptcy case on July 10, 2002). Defense Exhibit 8 (a projection of monthly expenses prepared by the Debtors shortly before trial) ("Exhibit D–8") and Plaintiff's Exhibit 1 (a projection of monthly expenses submitted by the Debtors on the day of trial) ("Exhibit P–1"). The following chart attempts to summarize the pertinent evidence as succinctly as possible.

18. Richard Hicks' monthly income was calculated as follows: In 2004, his bi-weekly income, after taxes and deductions for health insurance, was $1,896.40. This amount was multiplied by 26 to determine the total yearly net income ($49,306.40). Yearly net income was divided by 12 to yield the total net monthly income ($4,108.87). This Court finds credible Rebecca Hicks' testimony that the amount deducted from Richard's gross wages to cover health insurance premiums was scheduled to increase slightly beginning January 2005. Thus, the slightly lower amount of monthly net income for Richard Hicks, in the amount of $4,075.33, likely correctly represents the anticipated monthly income for 2005.

| Expense | Schedule J | Exhibit D–8 | Exhibit P–1 |
|---|---|---|---|
| Mortgage | $2250.00 | $1420.00 * | $1420.20 * |
| Homeowner's Insurance | $60.00 | Included in mortgage | Included in mortgage |
| Utilities: *Total* | *$325.00* | *$620.33* | *$700.00* |
| (Electricity) | 200.00 | $99.44 | Not itemized |
| (Heating Oil) | Incl. w/elec. | $150.00 | Not itemized |
| (Telephone) | $75.00 | $62.87 | Not itemized |
| (Basement Heater) ** | N/A | $96.67 ** | Not itemized |
| (Cable/Internet) | N/A | $90.62 | Not itemized |
| (Cell Phone) | N/A | $62.02 | Not itemized |
| (Water/Trash) | $50.00 | $58.75 | $75.00 |
| Home Maintenance | $100.00 | N/A | $400.00 |
| Food | $600.00 | $1,876.33 *** | $1000.00 |
| Laundry/Dry Cleaning | $50.00 | N/A *** | N/A |
| Clothing | $150.00 | N/A *** | $200.00 |
| Recreation | $100.00 | N/A | N/A |
| Charitable Contributions | $25.00 | N/A | N/A |
| Life Insurance | $250.00 ‡ | $25.00 | $25.00 |
| Car Payments | $247.78 | $684.00 | $684.00 |
| Car Insurance | $100.00 | $155.42 | $160.00 |
| Other Transportation Costs (primarily gas) | $150.00 | $207.83 | $300.00 |
| Pre–School Tuition | N/A | $75.50 † | N/A |
| Taxes | N/A | $119.33 | $50.00 |
| Medical Expenses: *Total* | *$250.00* | N/A *** | *$550.00* |
| (Doctors' Bills & Co–Pays) | Not itemized | | $350.00 |
| (Optician & Lens) | Not itemized | | $200.00 |
| Other Listed Expenses: *Total* | N/A | *$1,171.17* | N/A |
| ("ATM Withdrawals") | | $610.25 | |
| ("Checks") | | $560.92 | |
| **Total** | **$4,657.78** | **$6,354.07** | **$5,489.00** |

\* This decrease is the result of the Debtors' refinancing their mortgage prior to trial.
\*\* Rebecca Hicks testified at trial that the Debtors entered into a monthly payment plan to finance the purchase of a new heater, which will be paid off by January 2003.
\*\*\* Exhibit D–8 does not separately itemize several expenses. Included in the $1,876.33 are "food, clothes, sundries, prescriptions, co-pays, medical."
‡ This appears to be merely a typographical error given the amounts listed in Exhibits D–8 and P–1.
† Due to the Debtors' daughter's attendance at a public kindergarten beginning in the Fall of 2005, this expense should no longer be applicable, as reflected in Exhibit P–1.

### 5. *Student Loan Payments*

ECMC presented three payment schedules for Rebecca Hicks' student loans: (1) $538.80 per month over 20 years; (2) $470.70 per month over 25 years; and (3) $426.91 per month over 30 years.

### B. Positions of the Parties

Rebecca Hicks argues that excepting her student loan debts from discharge will impose an undue hardship on the Debtors and the Debtors' dependents because their current inability to make payments on the student loans while maintaining a minimal standard of living is not likely to improve

in the foreseeable future. She maintains that the Debtors' expenses are reasonable given the age of their home, their need for two reliable vehicles, the lack of public transportation and the high cost of necessary medical expenses. Rebecca Hicks further predicts that, because of her MS, her income will not increase in the future and, in fact, will most likely decrease. In addition, she contends that Richard Hicks' income is "fairly steady" and is unlikely to increase because he cannot find a higher-paying job that allows him to be available evenings and weekends to help care for the children.

ECMC does not dispute that the Debtors' Income is unlikely to substantially Increase in the foreseeable future, and admits the possibility that Rebecca Hicks' illness may cause a decrease in household income. However, ECMC posits that the Debtors have not proven undue hardship as required by § 523(a)(8) because their present income, even if decreased, is sufficient to maintain the household at a minimum standard of living while still repaying the student loans. More specifically, ECMC points to substantial increases in the Debtors' expenses, even after the decrease of the Debtors' mortgage payments and discharge of other unsecured debts. Because the Debtors have not minimized their expenses, ECMC argues that the student loans are not dischargeable on the basis of undue hardship.

## C. Discussion

### 1. The Legal Standard: A Quick Review

■ The burden is on the plaintiff in a § 523(a)(8) dischargeability action to prove, by a preponderance of the evidence, that failure to discharge the student loans will cause undue hardship to Rebecca Hicks or her dependents.[19]

As stated above, the focus of this Court's analysis is on one central question: Can the Debtors now, and in the foreseeable future, maintain a reasonable, minimal standard of living for Rebecca Hicks and her dependents and still afford to make payments on the student loans? In deciding this question, the Court will consider the Debtors' past, present and reasonably reliable future income, the amount of the Debtors' living expenses and any other relevant evidence of the Debtors' circumstances.

### 2. Analysis

■ As detailed above, the Debtors' current net monthly income from wages alone is $5,488.33. This amount is not likely to substantially decrease in the foreseeable future. First, Richard Hicks has been continuously employed at the same job for five years, and there is no indication that this is expected to change. Moreover, although Rebecca Hicks argued that Richard's salary was not likely to increase, it appears that it *has* increased substantially in the past few years. For instance, Richard Hicks' W–2 for 2001 shows gross pay of $59,516.98. His earn-

---

**19.** "The creditor bears the initial burden of proving the debt exists and that the debt is of the type excepted from discharge under § 523(a)(8)." *Educ. Credit Mgmt. Corp. v. Savage (In re Savage)*, 311 B.R. 835, 839 (1st Cir. BAP 2004). Neither of these issues is in dispute in the present case, and this Court finds that they have been proved. "Once the threshold showing has been made, the burden shifts to the debtor to prove by a preponderance of the evidence that excepting the student loan debt from discharge will cause the debtor and her dependents 'undue hardship.'" *Id.* (citing *Grogan v. Garner*, 498 U.S. 279, 287, 111 S.Ct. 654, 112 L.Ed.2d 755 (1991)).

ings statement for 2004, however, shows gross pay of $75,197.71—an increase of approximately $15,680.00. While this may not necessarily signal a continued pattern of raises through the foreseeable future, it does compel this Court to conclude that his income is not likely to decline.[20]

Although Rebecca Hicks testified that her income was not likely to substantially decrease, she did indicate that it may be affected by her need to take time off to care for herself or her children. The payroll history report shows, however, that her total earned sick time for 2004 was 103.120 hours, and the actual time taken was 109.837 hours, a difference of 6.717 hours, or $146.23 at the rate of $21.77 per hour. No evidence was presented from which the Court could conclude that the differences in time earned and time taken are likely to change substantially in the foreseeable future. And, since the net amount of income cited above reflects the financial impact of the unpaid time taken, it is also fair to conclude that there will be no drastic reduction in Rebecca Hicks' income in the foreseeable future.

Finally, the Debtors can also anticipate receipt of tax refunds in the future. There was some initial confusion in the testimony regarding amounts owed to either Connecticut or the Federal Government for unpaid taxes. After questioning by the Court and by counsel for ECMC, however, Rebecca Hicks testified that those amounts have been fully paid, and no outstanding taxes are owing.[21] Thus, estimating a reasonable amount of $1,400.00 (as also suggested by ECMC at trial) in tax refunds each year, the Debtors' net monthly income is increased by $116.67.

The bottom line is that the Debtor's monthly income can be fairly estimated to remain no less than their 2004 levels for the foreseeable future. Based on the testimony, Rebecca's net monthly income was $1,413.00; Richard's net monthly income (adjusted for a slight reduction anticipated for 2005, but excluding any bonus) was $4,075.33. To that total of $5,488, the Court adds the effect of the tax refund, further increasing the net monthly income by $116.67 to $5,605.00. And finally, the net monthly income must further increase on account of Richard's bonus. Even if the Court was to reduce the amount of the most recently received bonus ($7,360.20) by a third to account for any tax reduction or other variance, the resulting increase to monthly net income would be approximately $400 per month for a total of $6,005.00.

Rebecca Hicks has had three opportunities to demonstrate the amount of the Debtors' expenses. They have gone from $4,657.78 to $6,354.07 to $5,489.00. The last estimate is her testimony at trial. She should be held a number no greater than that amount. ECMC maintains that the number is too high, pointing to some per-

---

**20.** This income included $7,360.20 in bonuses in 2004. Rebecca Hicks testified that there is "no guarantee" that Richard will receive future bonuses. Her testimony, however, does not persuade the Court that Richard's receipt of future bonuses is too unpredictable to be considered in calculating the Debtors' foreseeable income. There was no evidence that the bonus had not been received in any of the years for which Richard worked at his present employment, and there was no testimony indicating a reason to anticipate some change in the future.

**21.** Rebecca Hicks also testified, as to any future liability for outstanding taxes, that "with [Richard Hicks] working in Connecticut ... we don't always know what we owe or we don't [sic]. We don't know." This Court finds such testimony to reflect the Debtors' lack of diligence in ascertaining their tax liabilities; it does not persuade the Court that the receipt of future tax return amounts is not capable of reasonable estimation.

ceived excesses in the individual categories.[22] This Court may be inclined to agree; but ECMC's criticism is moot. The Debtors' household income stands at $6,005.00; the household expenses stand at $5,489.00. The difference of $516.00 per month is more than sufficient to make a payment on the student loans under ECMC's proposed 25–year payment plan or 30–year payment plan.

## IV. CONCLUSION

Although this Court acknowledges that medical and financial difficulties can put much strain on a family, the evidence presented by the Debtors compels the Court to conclude that their current and reasonably foreseeable future income is sufficient to meet their necessary expenses while allowing for repayment of the student loans incurred by Rebecca Hicks. This Court does not trivialize the difficulties these Debtors face. However, after employing its best efforts to craft an appropriate measure, and using data provided by the Debtors themselves without a more careful analysis of criticized expenses, this Court finds and rules that excepting Rebecca Hicks' student loans from discharge would not impose an undue hardship on the Debtors and the Debtors' dependents within the meaning of § 523(a)(8) of the Bankruptcy Code.

---

**22.** By way of only one example, the Debtors apparently purchased two new cars in 2004, increasing their car payments since the commencement of this case by over $400 per month.