FOR PUBLICATION

# UNITED STATES BANKRUPTCY APPELLATE PANEL
## FOR THE FIRST CIRCUIT

---

**BAP NO. MS 21-021**

---

**Bankruptcy Case No. 18-30578-EDK**
**Adversary Proceeding No. 19-03003-EDK**

---

**TAMARA SARA PARVIZI,**
**Debtor.**

---

**TAMARA SARA PARVIZI,**
**Plaintiff-Appellant,**

**v.**

**UNITED STATES OF AMERICA,**
**on behalf of the Department of Education,**
**Defendant-Appellee.**

---

**Appeal from the United States Bankruptcy Court**
**for the District of Massachusetts**
**(Elizabeth D. Katz, U.S. Bankruptcy Judge)**

---

**Before**
**Godoy, Lamoutte, and Harwood,**
**United States Bankruptcy Appellate Panel Judges.**

---

**Tamara Sara Parvizi, Pro Se, on brief for Appellant.**
**Raquelle L. Kaye, Esq., on brief for Appellee.**

---

**July 29, 2022**

---

**Lamoutte, U.S. Bankruptcy Appellate Panel Judge.**

After a trial, the bankruptcy court determined that the more than $650,000 in student loan debt Tamara S. Parvizi (the "Debtor") owed to the United States Department of Education (the "DOE") was excepted from discharge under § 523(a)(8).[1] The Debtor appealed. Finding no error of law or fact by the bankruptcy court, we **AFFIRM**.

## BACKGROUND

### I.     The Debtor's Bankruptcy Filing

The Debtor filed a chapter 7 bankruptcy petition in July 2018. On her bankruptcy schedules, she listed minimal assets totaling about $9,800, consisting primarily of a car and some electronics. She identified a single secured creditor with an $8,664 claim secured by a lien on her car and more than $630,000 in unsecured claims, which was mostly student loan debt. The Debtor indicated she earned $1,600 per month working as an adjunct professor at a community college and her monthly expenses totaled $1,740.

The Debtor received a chapter 7 discharge on January 28, 2019.

### II.     Adversary Proceeding

Two days after receiving her discharge, the Debtor commenced an adversary proceeding against the DOE seeking to discharge her student loan debt. In her complaint,[2] the Debtor alleged she had incurred $500,000 in student loans to attend St. George's University School of Medicine. After earning her medical degree, she began a residency program in psychiatry at the University of Vermont Medical Center ("UVM Medical Center"). She did not complete the

---

[1]  All references to specific statutory sections are to the United States Bankruptcy Code, 11 U.S.C. §§ 101-1532.

[2]  The Debtor's "complaint" was in the form of a two-page letter to the bankruptcy court. She did not cite § 523 or specifically request to discharge her debt. However, the court (and the DOE) treated the "letter" as a complaint seeking to discharge the Debtor's student loan debt under § 523, and we do the same.

program, however, due to a dispute with the program's director. She claimed the director was intent on "dispos[ing] of her" by "ruining [her] reputation." She also complained that, unbeknownst to her, the director had an "unpleasant history with regard to treatment of certain residents" and had failed to disclose a successful lawsuit against the program by a former resident.

The Debtor further alleged that after leaving the residency program in 2013, she "applied to hundreds of residency programs . . . and met with failure each time." She emphasized she was, at that time, 50 years old, had "zero savings," and the only job she could find was teaching biology courses as an adjunct faculty member at various local colleges, which was not a stable source of income. The Debtor stated that her income for the prior month (December 2018) was only $1,072 and she was one month behind on her rent payment and two months behind on her car payments. She was unable to "put . . . money away for a rainy day," she explained, and was "simply trying to survive." She expressed that "[i]t would be nice to be able to get a little money back from [her] federal taxes at the end of the year . . . rather than . . . having it all go towards a student [loan] debt that [she] c[ouldn't] even imagine being able to pay off . . . ."

## III.    Stipulated Facts

The matter was scheduled for a trial on September 29, 2020. About a week before trial, the parties filed a joint pretrial memorandum setting forth their stipulated facts, as described below.

### A.    The Debtor's Student Loans

The Debtor was 50 years old and resided in Providence, Rhode Island. She had no physical or mental health issues or disabilities that limited her ability to work, and she had no dependents. Between 2007 and 2013, the Debtor received various student loans to fund

3

her education.  As a result of that education, the Debtor has obtained multiple degrees, including a master's degree and a medical degree.  She is also fluent in four languages.

The Debtor owes two types of loans to the DOE: (1) federal government funded loans through the William D. Ford Federal Direct Loan Program (the "Direct Loans"); and (2) privately funded student loans that were guaranteed and held by the federal government through the Federal Family Education Loan Program (the "FFELP Loans") (collectively, the "student loans").  As of September 10, 2020, the Debtor owed the DOE more than $650,000 on her student loans.  The Debtor has made no payments toward her student loans except for $3,960.95 in income tax refunds which were credited to her student loan account through the Treasury Offset Program.

The Direct Loans are eligible for participation in the Revised Pay As You Earn ("REPAYE") income-based repayment program, and the FFELP Loans would be eligible upon consolidation with the Direct Loans.[3]  Based on an estimated Adjusted Gross Income of $28,668, the Debtor would pay $80 per month for 25 years under the REPAYE program and the balance remaining at the end of the 25-year term would be forgiven and canceled.  There is no evidence in the record as to what the Debtor's monthly loan payments would be without the assistance of an income-based repayment plan.

---

[3]  Under the REPAYE program, a borrower's aggregate monthly loan payment is limited to 10% of the amount by which the borrower's adjusted gross income exceeds 150% of the federal poverty guideline applicable to the borrower's family size, divided by 12.  If the borrower participates in REPAYE for 25 years (for graduate loans), the entire loan balance, including accrued interest, is forgiven and the DOE cancels the debt.  If a borrower earns less than 150% of the poverty level for the borrower's family size, the monthly payment is $0.  Years during which a borrower's monthly payment is $0 count equally towards the repayment period.  Because the monthly REPAYE payment is calculated as a percentage of a borrower's income, if a borrower's income drops, the monthly payment is reduced accordingly.  The monthly payment amount is recalculated annually.

The Debtor was previously enrolled in an income-based repayment plan with a monthly payment of $0, effective September 21, 2014. However, her enrollment ended after 12 months because she failed to recertify her income. Although she remained eligible, she did not re-enroll in any further income-based repayment programs and is "unwilling" to do so.

### B.    The Debtor's Education and Employment History

In 1990, the Debtor obtained a bachelor's degree from Clark University. Thereafter, she attended the University of Rochester School of Medicine from 1991 to 1995 but voluntarily left before receiving a degree. In 1997, the Debtor enrolled in a graduate program at the University of Massachusetts Amherst and received a master's degree in public health in 1999.

Thereafter, she worked as an assistant program director for a community health organization in Worcester, Massachusetts, earning an annual salary of $30,000-$40,000. She left that position after six months to become the director of a public health program affiliated with UMass Memorial Medical Center, where she earned approximately $50,000 per year. The Debtor left that position after six months because "she was not committed to the organization's mission."

For the next seven years, until attending medical school for the second time in 2008, the Debtor cared for her father, pursued her artistic interests, performed odd jobs, and worked as a substitute teacher. During this period, in 2007, the Debtor received a $100,000 inheritance. At that time, her student loans were in default and she owed approximately $123,000. The Debtor offered the DOE $45,000 to "compromise" that debt, but the offer was rejected. She did not use any of her inheritance to pay her student loans and has since spent the entire $100,000.[4]

---

[4] At a deposition conducted on December 19, 2019, the Debtor explained that when she received the inheritance, she was not working much and so she "lived off of th[at] money."

In 2008, the Debtor returned to medical school at St. George's University School of Medicine, incurring an additional $500,000 in student loans. She graduated with a Doctor of Medicine degree in 2012 and then began a residency program in psychiatry at UVM Medical Center, earning $50,000 per year. She did not complete the program, however, due to a "conflict with the program director." As a result of the "conflict," the Debtor was placed "on leave" and she ultimately resigned from the program. Her voluntary resignation from the residency program was noted in an April 2013 letter of reference from UVM Medical Center, which acknowledged the Debtor had successfully completed her clinical rotations.

The residency program continued to pay the Debtor her annual salary until June 2013. The Debtor then spent the next five years applying for residency programs in psychiatry, family medicine, and pathology. She was not offered a position in another residency program, and she never became licensed to practice medicine.

### C. The Debtor's Income and Expenses

Since departing her residency program, the Debtor has worked primarily as an adjunct professor, tutor, and substitute teacher. She earned $28,668 in 2019, $41,336 in 2018, $20,876 in 2017, and $21,588 in 2016. At the time of trial, she worked as an adjunct professor at the Massachusetts College of Pharmacy and Health Sciences, earning about $3,400 per month. Her monthly expenses totaled $1,598, including: $800 for rent; $85 for a storage unit; $108 for car insurance; $45 for renter's insurance; $60 for cell phone charges; $300 for groceries; and $200 for "discretionary expenses." Over the course of 2020, the Debtor's surplus income after payment of her expenses ranged from $400 to $1,800 per month.

## IV.     Trial

The bankruptcy court conducted a trial on September 29, 2020.  The court heard testimony from the Debtor, and numerous exhibits were admitted into evidence.

### A.     The Debtor's Direct Testimony

The Debtor devoted much of her testimony to describing her problems with the residency program at UVM Medical Center.  She explained that although the program's director "recruited" her "quite aggressively," the director gave her negative feedback from the outset and she was eventually put on a "modification plan," which identified certain "performance deficits." Although she attempted to rebut the accusations against her, she was eventually placed on a leave of absence pending a hearing before the residency committee.  When she began looking for an attorney to represent her, she discovered that the year before she entered the residency program, another psychiatric resident at UVM Medical Center had prevailed in a major lawsuit against the program for breach of her employment contract.

The Debtor explained that because the hearing before the residency committee did not occur within four weeks, she missed the window to try to transfer to another program through the residency "scramble" which occurs every spring at the conclusion of the annual "match" process. She ultimately resigned from the program and then spent the next five years applying to residency programs in psychiatry, family medicine, and pathology without success.  She was at that time teaching as an adjunct professor and substitute teacher, without any benefits or job security.

### B.     Cross-Examination by the DOE

On cross-examination, the Debtor confirmed her monthly expenses were approximately $1,600, which included $200 for "discretionary spending."  She agreed her income was

"variable," but she did have periods of time where she had extra income after paying her monthly expenses. She did not save any of that money and could not recall how she spent it. When asked whether, during a two-month period in mid-2019, she spent over $1,500 at clothing stores, at household gift shops, and on Etsy.com and more than $900 on meals out, coffee, and Amazon and PayPal purchases, she agreed it was "possibl[e]."

The Debtor confirmed she was unwilling to participate in an income-based repayment program and insisted she could not afford to pay $80 per month toward her student loans under such a program. When questioned if she spends more than $80 per month on discretionary purchases, the Debtor responded: "I can't answer that question."

When she was asked whether she has sought work in the medical field after leaving UVM Medical Center (other than applying for residency programs), the Debtor responded that in 2013-2014, she sought work as a program manager for various research programs without success so she "gave up after a while." When asked whether she "felt that jobs like being a phlebotomist or a medical assistant were not as dignified a way to use [her] knowledge," the Debtor responded: "I'm qualified to teach. I have a good basis of scientific knowledge, biology in particular, and that's what I've been doing and I enjoy doing it." She further stated: "I feel like I've suffered enough of a loss that I deserve a sense of dignity in terms of knowing that I'm doing something . . . that I consider worthwhile." When asked if she agreed she had "not sought to maximize [her] income," she responded that she "didn't go into medicine to make money," and her current goal was to find a stable teaching job so she could "live more or less comfortably."

The Debtor further testified she did not believe she should have to pay back any of her student loans and admitted she had not made a single voluntary payment on her student loan debt:

Q: . . . Ms. Parvizi, you do not believe you should be required to repay your student loans, correct?

A. Yes, because . . . I believe, in fact, there is a law on the books for excusing payment of student loans based on whether you've been bamboozled out of your education, out of . . . some kind of training and I hope that I've proven my case that I have been cheated in no uncertain terms—

. . . .

Q: Thank you. And . . . just to be clear, you have never once made a single voluntary payment towards your student loan debt, is that correct?

A: That is correct, yes.

### C.      The Debtor's Testimony on Redirect Examination

During her redirect examination, the Debtor insisted she had "knocked on every door" in an effort to "recover" her profession and she "had every intention of" paying her student loans. The bankruptcy court queried why, then, was she unwilling to participate in an income-based repayment program:

Q: . . . [L]et me ask you this question, Ms. Parvizi, because . . . you briefly for 12 months entered the income-based repayment program and then failed to fill out . . . a form . . . . and during that whole 12 months your payment was zero dollars. So why are . . . you[] unwilling . . . to enter that income-based repayment program? Please answer that question.

A: Yeah. Because I guess after a conversation with someone at that time and after some thinking on my own, I realized why should I pay for the mistakes of a residency program director whose behavior has cost me my life, my pursuit of happiness. . . . Why should I pay for that person's mistake? I mean, the hospital paid for her mistakes once months before I entered that program and here I am. . . .

Q: But why is it the fault of the Department of Educa[tion]—

A: Why should I pay for her mistake?

Q: Ms. Parvizi, but why is that the fault of the Department of Education?

9

A:  Well, isn't there . . . a law . . . where the Department of Education forgives loans that have been taken out by people . . . at [un]accredited institutions . . . [that] took student money and basically left them with something . . . really worthless.

I think I'm trying to make a similar argument . . . .  [T]he way that I was dismissed from my training was completely outrageous . . . .  [W]hy should I be beholden to pay back . . . money that was supposed to be put towards my training [but] was not . . . .

### D.      The DOE's Closing Argument

During her closing argument, the DOE's counsel emphasized that the Debtor had more than $650,000 in outstanding student loan debt, had never made a single voluntary payment toward her student loans, and her "refusal to make payments towards her student loans began long before her issues with her residency program."  She further argued that while the Debtor's experience with her residency program was not ideal, her focus on those circumstances was "misplaced."  The court was required to look at the totality of the circumstances, which reflected the Debtor had a "history of substantial discretionary spending" and she consistently had enough surplus income to pay $80 per month toward her student loans under an income-based repayment program.  She argued:

> DOE is only asking her to contribute a small fraction of that discretionary income to her taxpayer funded debt.  If [the Debtor] is unable to maintain the same level of income next year her payments will decrease accordingly and could be as low as zero dollars per month and still count towards her repayment obligation.

> At the end of the program the debt will be discharged, regardless of whether there's any outstanding balance due.  One cannot reasonably conclude that asking [the Debtor] to enroll in an income-based repayment program and repay some portion of her student loans would create an undue hardship.

### E.      The Debtor's Closing Argument

In her closing argument, the Debtor re-emphasized that her problems with the program director at UVM Medical Center "ruined [her] career."  "[I]f none of this . . . is enough to convince you that I've had my life ruined [and] that it's okay for someone who has had their life

10

ruined to spend an extra $1500 at some point [rather than] put that money towards paying student loans . . . that were taken out for training that never happened, [then] maybe the FBI should investigate," she argued.

## V.    The Court's Ruling and Subsequent Events

### A.    First Amended Judgment and Amended Memorandum of Decision

On May 13, 2021, the bankruptcy court entered an Amended Judgment (the "First Amended Judgment") and Amended Memorandum of Decision ruling that the Debtor's student loan debt was excepted from discharge under § 523(a)(8).[5]  Applying the totality of the circumstances test—which the parties had stipulated was the appropriate test and which courts in Massachusetts have previously adopted—the bankruptcy court concluded the Debtor did not prove by a preponderance of the evidence that excepting her student loan debt from discharge would impose an undue hardship.  The court reasoned:

> Here, the Debtor is highly educated, has no dependents, suffers from no physical or mental conditions that impede her ability to work, and, at age fifty-one, likely has many more years of being able to productively work before retirement.
>
> While the Debtor attempted to place the blame for her inability to make payments on her student loans upon her uncompleted residency program and at several points stated that she had "knocked on every door," she has also acknowledged that a substantial barrier toward repayment has been her own lack of motivation to increase her earnings—"[r]ealistically, there is no way I can make a dent in this given my lack of ambition for making money." Dep. Tr. 82:11-26.  Simply put, while the trajectory of her medical residency experience was not ideal, the Debtor has not shown any effort to maximize her income based on her education and marketable skills. *The Debtor may not have the willingness, but she certainly has the capability, to find a higher-paying job that would better exploit her education and experience or to supplement her income with additional part-time work.* See Joyce [v. Mt. Peaks Fin. Servs. (In re Joyce), BAP No. MW 05-010, 2005 WL 3946869 (B.A.P. 1st Cir. July 29, 2005)] (debtor who argued his medical degree was not marketable because debtor had not completed residency and had left the medical field several years ago did not prove that he had "exhausted all

---

[5]  The bankruptcy court entered its initial Judgment and Memorandum of Decision on May 12, 2021, but entered amended versions the next day.

opportunities available to someone with his educational background and professional experience").

However, common sense leads the Court to conclude that, with over $650,000 in outstanding student loan debt, the monthly payment amount outside of an income-based repayment program would likely be insurmountable even were the Debtor to maximize her income. *But the Debtor's ability to participate in the REPAYE program weighs heavily against the Debtor's argument that repayment of the student loans would impose an undue hardship.* The evidence presented at trial, and stipulated to by the Debtor, demonstrates that the Debtor has consistently had monthly discretionary income sufficient to make the estimated $80 per month payment towards her student loans under the REPAYE program. *In fact, based on the evidence presented, the Court finds that the Debtor has consistently had more than sufficient discretionary income to allow the Debtor to comfortably participate in an income-based repayment program, despite any protestations to the contrary.*

In sum, based on the totality of the circumstances, the Debtor has not proven by a preponderance of the evidence that excepting her student loans from discharge would impose an undue hardship pursuant to § 523(a)(8).

Parvizi v. U.S. Dep't of Educ. (In re Parvizi), Adv. Pro No. 19-3003, 2021 WL 1921121, at *6-7

(Bankr. D. Mass. May 13, 2021) (emphasis added) (footnote omitted). However, the court

further ruled:

[T]he Court does find that to the extent the Debtor is unable to repay the student loans in full by the end of any applicable income-contingent repayment program, the negative amortization of the debt and accrued interest would undoubtedly constitute an undue hardship to the Debtor at that time. . . .

Accordingly, judgment will enter for the DOE, except that pursuant to § 105(a), the Court will order that any student loan debt remaining unpaid upon the Debtor's completion of the REPAYE program or any comparable program is deemed discharged as an undue hardship pursuant to § 523(a)(8).

Id. at *7. Consistent with the Amended Memorandum of Decision, the First Amended Judgment

provided:

For the reasons set forth in the Court's Memorandum of Decision dated May 13, 2021, judgment is hereby entered in favor of the defendant, United States Department of Education (the "DOE"), and against the plaintiff, Tamara Sara Parvizi (the "Debtor"), except that pursuant to 11 U.S.C. § 105(a), any of the Debtor's student loan debt currently held by the DOE that remains outstanding

12

upon the Debtor's completion of payments under the REPAYE program or any similar income-based repayment program is deemed discharged pursuant to 11 U.S.C. § 523(a)(8). In the event the Debtor is not eligible for REPAYE or a similar program, this judgment is without prejudice to the Debtor's right to file a renewed request for discharge of the student loans and a review of the Debtor's situation.

### B.      Motion to Alter or Amend

The DOE filed a Motion to Alter or Amend Judgment (the "Motion to Amend"), asking the court to remove language in the First Amended Judgment providing that any outstanding debt upon the Debtor's completion of an income-based repayment program would be deemed discharged under § 523(a)(8). The DOE argued that whether the Debtor may experience undue hardship at an undetermined point in the future was not ripe for determination. The Debtor did not oppose the Motion to Amend.

### C.      Notice of Appeal

While the Motion to Amend was still pending, on June 8, 2021, the Debtor filed her notice of appeal.[6]

### D.      Order Granting Motion to Amend and Second Amended Judgment

On July 28, 2021, the bankruptcy court entered an order granting the DOE's Motion to Amend (the "Order Granting Motion to Amend"), ruling in relevant part:

The Motion to Amend the Judgment is hereby GRANTED inasmuch as the Court's ruling that any student loan debt held by the DOE after the completion of payments under an income-based repayment plan would be discharged was beyond the scope of the arguments raised and evidence presented by the Debtor. . . . Accordingly, the Court will enter an amended judgment in favor of the DOE which removes the provision that any remaining student loan debt owed to the DOE after the completion of the REPAYE or similar program is deemed excepted from the

---

[6] Although the Debtor identified the order on appeal as the "5/12/2021" judgment, she attached to her notice of appeal the First Amended Judgment, which replaced the May 12, 2021 judgment. We conclude, therefore, that the Debtor intended to appeal the First Amended Judgment. See Batiz Chamorro v. Puerto Rican Cars, Inc., 304 F.3d 1, 3 (1st Cir. 2002) (instructing appellate courts to "construe notices of appeal liberally and examine them in the context of the record as a whole") (citation omitted).

Debtor's discharge pursuant to 11 U.S.C. § 523(a)(8). A separate form of judgment will enter forthwith.

The bankruptcy court then entered the Second Amended Judgment, which eliminated the language challenged by the DOE, providing:

> For the reasons set forth in the Court's May 13, 2021 Amended Memorandum of Decision and the Court's July 28, 2021 Order granting the Motion to Alter or Amend Judgment filed by the United States Department of Education, judgment is hereby entered in favor of the defendant, United States Department of Education, and against the plaintiff, Tamara Sara Parvizi (the "Debtor"). The Debtor's student loans currently held by the United States Department of Education are *not* discharged pursuant to 11 U.S.C. § 523(a)(8), except that in the event the Debtor is not eligible for REPAYE or a similar program, this judgment is without prejudice to the Debtor's right to file a renewed request for discharge of the student loans and a review of the Debtor's situation.

### E.    No Amended Notice of Appeal

The Debtor did not amend her notice of appeal to include the Order Granting Motion to Amend, and she does not challenge—in either her statement of the issues on appeal or in her appellate brief—the bankruptcy court's alteration to the First Amended Judgment as part of this appeal.

## POSITIONS OF THE PARTIES

### I.    The Debtor

On appeal, the Debtor argues that the bankruptcy court erred in determining the repayment of more than $650,000 in student loan debt would not cause her "undue hardship." She emphasizes that, although she is a single woman, with only "one car to [her] name," no savings, no home, no job security, and an annual salary of only $20,876-$41,336, the court erroneously concluded she has "'sufficient discretionary income' to spare monthly payments toward student loans amounting to over $650,000" while maintaining a "reasonable, minimal standard of living." (emphasis omitted).

14

The Debtor claims the bankruptcy court "belittled" her job search efforts, ignoring that she had applied to hundreds of residency programs without receiving a single interview and failing to recognize that opportunities in the medical field are "scarce and extremely competitive," particularly for physicians who are not board-certified. She also argues the bankruptcy court misinterpreted her statements regarding her "coping attitude"—whereby she "lowered her ambitions" in response to "such abject rejection" in her job search—and erroneously found her inability to pay her student loans was due to "her own lack of motivation to increase her earnings."

Finally, the Debtor contends the bankruptcy court "[m]isrepresented" and disregarded the circumstances surrounding her resignation from the residency program at UVM Medical Center. She spends a significant portion of her brief arguing that, because she was duped into accepting a position in the residency program at UVM Medical Center based on the director's misrepresentations and failure to disclose a successful lawsuit against the program based on "resident abuse," she should not have to repay her student loans.

The Debtor offers no case law or other legal authority to support any of her arguments, other than references to 34 C.F.R. § 685.206 which, she claims for the first time on appeal, provides borrowers with a "defense to repayment" of student loans based on "misrepresentation by an institution."

## II.     The DOE

The DOE counters there was no error by the bankruptcy court as the Debtor had not established, under the totality of the circumstances, that repayment of her student loans would cause her undue hardship. The Debtor's past, present, and future financial resources indicate she can make monthly payments toward her student loans while maintaining a minimal standard of

15

living, the DOE claims. A review of her employment history and her reasonable and necessary living expenses reveals she has sufficient surplus income to make payments through an income-based repayment plan. Further, citing Smith v. U.S. Department of Education (In re Smith), 499 B.R. 55, 63-64 (Bankr. D. Mass. 2013) (denying discharge where the court was unable to "say with certainty that the Debtor ha[d] exhausted her earning potential"), the DOE argues that although the Debtor has maintained employment, she has not attempted to maximize her income in order to pay her loans.

Finally, the DOE argues that to the extent the Debtor "attributes her current financial situation to her inability to complete a residency program, it was ultimately her choice to seek additional education and, in doing so, to assume additional student loan debt." According to the DOE, the bankruptcy court correctly observed that "[t]he focus of the Court in determining whether a debtor has established undue hardship under § 523(a)(8) is not on whether the debtor's student loan funded education yields any particular result the debtor anticipated or hoped for."

## APPELLATE JURISDICTION

"We are duty-bound to determine our jurisdiction before proceeding to the merits, even if not raised by the litigants." Segarra Miranda v. Banco Popular de P.R. (In re Rivera Mercado), 599 B.R. 406, 415 (B.A.P. 1st Cir. 2019) (citation and internal quotation marks omitted). In order to assess our jurisdiction, we must first identify the order or orders on appeal.

### I.     Scope of the Appeal

As noted previously, when the Debtor filed her notice of appeal, the DOE's Motion to Amend was pending before the bankruptcy court. Therefore, her notice of appeal was ineffective until the court entered the Order Granting Motion to Amend. See Fed. R. Bankr. P. 8002(b)(2) (providing that notice of appeal filed while post-judgment motion is pending is

16

ineffective until court disposes of the motion). Concurrently with the entry of the Order Granting Motion to Amend, the bankruptcy court also entered the Second Amended Judgment, which superseded the First Amended Judgment. See Atighi v. Green (In re Atighi), 243 F. App'x 283, 285 (9th Cir. 2007) ("An amended judgment supersedes the original judgment.") (quoting Munden v. Ultra-Alaska Assocs., 849 F.2d 383, 386 (9th Cir. 1988)). Consequently, the Second Amended Judgment was the only viable judgment when the Debtor's notice of appeal took effect, and it is the only judgment before us. See id.

Further, the Debtor did not amend her notice of appeal to include the Order Granting Motion to Amend. While the Debtor was not required to amend her notice of appeal to preserve her appeal,[7] in the absence of such an amendment she is precluded from challenging either the Order Granting Motion to Amend or the bankruptcy court's alteration to the First Amended Judgment in this appeal. See Fed. R. Bankr. P. 8002(b)(3) (providing that appellant who wishes to challenge order disposing of post-judgment motion or bankruptcy court's alteration to its prior judgment "must" file an amended notice of appeal); see also In re Thomas, 428 F.3d at 1269 ("Rule 8002(b) requires an amended notice of appeal when the bankruptcy court's ruling on a postjudgment motion alters the judgment and the appellant wishes to challenge *that alteration*."). Therefore, the propriety of the court's alteration to the First Amended Judgment—its elimination of language providing that any student loan debt remaining unpaid upon the Debtor's

---

[7] See Moldo v. Ash (In re Thomas), 428 F.3d 1266, 1269 (9th Cir. 2005) (stating amended notice of appeal required only if appellant wishes to challenge court's alteration to the judgment); see also United States v. Holy Land Found. for Relief & Dev., 722 F.3d 677, 683-84 (5th Cir. 2013) (stating, under analogous Fed. R. App. P. 4(a)(4)(B)(ii), that where appellant's appeal was directed at substance of original order and did not challenge lower court's alteration of that order, appellant's failure to amend its notice of appeal to include the amended order did not deprive the court of jurisdiction to hear the appeal).

completion of an income-based repayment program was deemed discharged—is not before us. See Bordenyuk v. Yanagi (In re Bordenyuk), 855 F. App'x 319, 320 (9th Cir. 2021) (ruling challenges to reconsideration order were not before appellate court where appellant did not amend notice of appeal); Baker v. Bank of Am., N.A., No. 19-CV-80782-RLR, 2019 U.S. Dist. LEXIS 214915, at \*8 (S.D. Fla. Dec. 12, 2019) (stating that appellant's failure to amend notice of appeal "divests the appellate court of jurisdiction to review the arguments and ruling on [motion to alter or amend]").  Our review, therefore, is limited to the Second Amended Judgment.

## II.    Finality

We have jurisdiction to hear appeals from final orders and judgments of the bankruptcy court.  See 28 U.S.C. § 158(a)-(c); see also Ritzen Grp., Inc. v. Jackson Masonry, LLC, 140 S. Ct. 582, 587 (2020).  "Generally, a bankruptcy court's order regarding the dischargeability of a debtor's student loans is a final order."  Schatz v. Access Grp., Inc. (In re Schatz), 602 B.R. 411, 421 (B.A.P. 1st Cir. 2019) (quoting Bronsdon v. Educ. Credit Mgmt. Corp. (In re Bronsdon), 435 B.R. 791, 796 (B.A.P. 1st Cir. 2010)).  Therefore, we have jurisdiction to hear this appeal.

## STANDARD OF REVIEW

"An 'undue hardship' determination is a question of law to which the de novo standard of review applies, but the factual findings underlying that determination are reviewed under the clearly erroneous standard."  Id. (citations omitted); see also In re Bronsdon, 435 B.R. at 796 (stating that an undue hardship determination "poses a mixed question of law and fact") (citations omitted).  De novo review means the appellate court does not "give any deference to the [trial] court's conclusion and look[s] at the legal issues with clear eyes."  Rivera-Colón v.

18

AT&T Mobility P.R., Inc., 913 F.3d 200, 207 (1st Cir. 2019) (citation omitted).  Under the clear error standard, the bankruptcy court's "findings of fact and the conclusions drawn therefrom ought not to be set aside 'unless, on the whole of the record, we form a strong, unyielding belief that a mistake has been made.'"  Gannett v. Carp (In re Carp), 340 F.3d 15, 22 (1st Cir. 2003) (citation omitted).  "[I]f the bankruptcy court's findings are supportable on any reasonable view of the record, we are bound to uphold them."  Id. (citations omitted).

## DISCUSSION

### I.     The Dischargeability of Student Loans: § 523(a)(8)

#### A.     The Applicable Standard

Section 523(a)(8) provides that "student loans are not subject to the general rule of dischargeability, but rather a student loan may be discharged only where the debtor can show that payment of the debt 'would impose an undue hardship on the debtor.'"  Brown v. Educ. Credit Mgmt. Corp., 581 B.R. 695, 698-99 (D. Me. 2017) (quoting 11 U.S.C. § 523(a)(8)), aff'd, No. 18-1012, slip op. (1st Cir. Mar. 13, 2019).  The creditor has the initial burden of establishing that the debt qualifies as the type excepted from discharge, and the burden then shifts to the debtor to establish that excepting the debt from discharge will cause an undue hardship on the debtor or the debtor's dependents.  Id. at 699; see also In re Bronsdon, 435 B.R. at 796.  "The debtor bears the ultimate burden of proving undue hardship by a preponderance of the evidence."  In re Bronsdon, 435 B.R. at 797 (citing Grogan v. Garner, 498 U.S. 279, 287 (1991)) (other citation omitted); see also Educ. Credit Mgmt. Corp. v. Jesperson, 571 F.3d 775, 779 (8th Cir. 2009).  "The burden is rigorous."  Jesperson, 571 F.3d at 779.  As the First Circuit has observed, "debtors have a 'formidable task' in establishing undue hardship because 'Congress has made the judgment that the general purpose of the Bankruptcy Code to give honest debtors a fresh start

19

does not automatically apply to student loan debtors.'" In re Schatz, 602 B.R. at 422 (quoting

Nash v. Conn. Student Loan Found. (In re Nash), 446 F.3d 188, 191 (1st Cir. 2006)). "Rather,

the interest in ensuring the continued viability of the student loan program takes precedence."

In re Nash, 446 F.3d at 191 (citation omitted). "For this reason, discharges for undue burden

are granted in only 'truly exceptional circumstances.'" Murphy v. Educ. Credit Mgmt. Corp.,

511 B.R. 1, 4 (D. Mass. 2014) (quoting T I Fed. Credit Union v. DelBonis, 72 F.3d 921, 927 (1st

Cir. 1995)).

Here, there is no dispute that the Debtor's student loans are of the type contemplated by

§ 523(a)(8). Therefore, the burden was on the Debtor to prove by a preponderance of the

evidence that excepting her student loan debt from discharge would cause her undue hardship.

See In re Bronsdon, 435 B.R. at 797.

**B.      Demonstrating Undue Hardship Under § 523(a)(8)**

"The Bankruptcy Code does not define 'undue hardship,' and the statute does not provide

guidance." In re Schatz, 602 B.R. at 422 (quoting Ablavsky v. U.S. Dep't of Educ. (In re

Ablavsky), 504 B.R. 709, 718 (Bankr. D. Mass. 2014)). Here, the bankruptcy court applied the

"totality of the circumstances" test to analyze undue hardship, which the parties agreed was the

appropriate test. As the Panel has previously held, "in the absence of controlling authority in this

Circuit, the Bankruptcy Court was free [to] choose its own approach to evaluate undue

hardship." Id. (quoting Educ. Credit Mgmt. Corp. v. Kelly (In re Kelly), 312 B.R. 200, 206

(B.A.P. 1st Cir. 2004)).

> Under the totality of the circumstances test, the debtor must demonstrate that:
>
> (1) his past, present, and reasonably reliable future financial resources; (2) his and
> his dependents' reasonably necessary living expenses; and (3) other relevant facts
> or circumstances unique to the case, prevent him from paying the student loans in

20

question while still maintaining a minimal standard of living, even when aided by a discharge of other prepetition debts.

In re Bronsdon, 435 B.R. at 798 (citations omitted).[8] "[D]istilled to its essence, the finding of undue hardship under § 523(a)(8) following the totality of the circumstances test rests on one basic question: 'Can the debtor now, and in the foreseeable near future, maintain a reasonable, minimal standard of living for the debtor and the debtor's dependents and still afford to make payments on the debtor's student loans?'" Id. at 800 (quoting Hicks v. Educ. Credit Mgmt. Corp. (In re Hicks), 331 B.R. 18, 31 (Bankr. D. Mass. 2005)).

> In answering this question, the Court should consider all relevant evidence—the debtor's income and expenses, the debtor's health, age, education, number of dependents and other personal or family circumstances, the amount of the monthly payment required, the impact of the general discharge under chapter 7 and the debtor's ability to find a higher-paying job[,] move or cut living expenses. In addition, other factors not listed here may impact a particular debtor's case.

In re Hicks, 331 B.R. at 31.

## II.     Applying the § 523(a)(8) Undue Hardship Standard

### A.     Past, Present, and Reasonably Reliable Future Financial Resources

To prevail under § 523(a)(8), "[t]he debtor must show not only that her current income is insufficient to pay her student loans, but also that her prospects for increasing her income in the future are too limited to afford her sufficient resources to repay the student loans and provide herself and her dependents with a minimal (but fair) standard of living." Educ. Credit Mgmt. Corp. v. Savage (In re Savage), 311 B.R. 835, 839-40 (B.A.P. 1st Cir. 2004) (citations omitted); see also Abdinoor v. Navient Solutions, Inc. (In re Abdinoor), Adv. Pro. No. 14-1048-BAH, 2015 WL 5178364, at *6 (Bankr. D.N.H. Sept. 3, 2015). "Simply put, if the debtor's reasonable

---

[8] Although the bankruptcy court did not expressly articulate the Bronsdon factors, it clearly considered the Debtor's income (both her current income and whether she was maximizing her income), her expenses, and other relevant circumstances, such as her eligibility to participate in an income-based repayment plan, when rendering its decision.

future financial resources will sufficiently cover payment of the student loan debt—while still allowing for a minimal standard of living—then the debt should not be discharged." Jesperson, 571 F.3d at 779 (citation and internal quotation marks omitted). Therefore, in determining a debtor's ability to pay, courts look not only at a debtor's current circumstances, but also the potential for the debtor to increase income in the future. See, e.g., In re Joyce, 2005 WL 3946869, at *3; Smith v. Educ. Credit Mgmt. Corp. (In re Smith), 328 B.R. 605, 611 (B.A.P. 1st Cir. 2005). "Although such an analysis necessarily involves a degree of speculation, a guiding principle, and one which adds certainty to the equation, is that [debtors are] expected to use their best efforts to maximize their income . . . ." Storey v. Nat'l Enter. Sys. (In re Storey), 312 B.R. 867, 873 (Bankr. N.D. Ohio 2004) (citations omitted); see also Parker v. Gen. Revenue Corp. (In re Parker), 328 B.R. 548, 552 (B.A.P. 8th Cir. 2005) (recognizing that a debtor in bankruptcy "has a duty to maximize her income") (citation omitted). Therefore, to prevail under § 523(a)(8), a debtor must "demonstrate that he exhausted all opportunities available to someone with his educational background and professional experience." In re Joyce, 2005 WL 3946869, at *4 (upholding bankruptcy court's finding that although debtor "had attempted to find employment compatible with his undergraduate and medical degrees, . . . 'a more extensive employment search would yield more positive results'"); see also In re Storey, 312 B.R. at 872 (stating that to prevail under § 523(a)(8), debtors "must have done everything within their power to improve their financial situation") (citation omitted).

The record reflects that when this case was tried in September 2020, the Debtor was 51 years old and in good health, suffered no mental or physical impairments impeding her ability to work, and had no dependents. She had an extensive education and, as a result of that education, she earned multiple advanced degrees. She was also fluent in four languages. See Jesperson,

22

571 F.3d at 780 (stating debtor's "young age, good health, number of degrees, marketable skills, and lack of substantial obligations to dependents or mental or physical impairments weigh[ed] in favor of *not* granting an undue hardship discharge") (citations omitted). The record also shows the Debtor was earning about $3,400 per month teaching biology as an adjunct professor at local community colleges, tutoring, and substitute teaching and she consistently had at least $400 of surplus income each month. Accordingly, the bankruptcy court's finding that the Debtor's current income was sufficient to make some payments on her student loans is clearly supported by the record.

The record also supports the bankruptcy court's finding that the Debtor "ha[d] not shown any effort to maximize her income based on her education and marketable skills," and that "a substantial barrier" to her repayment of her student loans was "her own lack of motivation to increase her earnings." While the record reflects that, after departing the residency program in 2013, the Debtor spent five years applying unsuccessfully to residency programs, it does not show she exhausted all possible avenues for obtaining other kinds of higher paying employment, especially for someone with her educational background and professional experience. See In re Joyce, 2005 WL 3946869, at *4. For example, prior to attending medical school for the second time, the Debtor held several higher paying jobs in the public health area—making as much as $50,000 a year—and although she left each position after only six months, she did so voluntarily rather than due to an inability to perform the job. She admitted, however, she did not pursue similar, more lucrative positions in the medical field after leaving her residency program because she had decided she preferred teaching.

It is also apparent from her testimony that the Debtor believes she is overqualified to work as a research assistant, phlebotomist, or medical assistant and that she "deserve[s] a sense

of dignity" in doing work she considers "worthwhile."[9] The Debtor further admitted she is not motivated to make money and does not care how much money she makes. At her deposition, the Debtor stated that she filed for bankruptcy in order to discharge her student loans as she was unlikely to ever "make a dent" in them given the large sum owed and her "lack of ambition for making money." It is clear from the record that debt repayment is not, and has never been, the Debtor's objective—in fact, she feels she should not have to repay any portion of her student loans. Rather, her goal is to find a steady teaching job that would enable her to "live more or less comfortably," without having to pay her student loans.

The record, therefore, supports the bankruptcy court's determination that while the Debtor has the education to maintain or increase her earnings in the future, she has not made every effort to maximize her income. Although the Debtor may believe she should not be compelled to seek more lucrative employment outside of her desired field, "[d]ebtors are expected to cast a wide net to maximize their income and, 'it is not uncommon for individuals to take jobs not to their liking in order to pay off their student loans, or for that matter to meet all sorts of other financial obligations.'" Bukovics v. Navient Solutions LLC (In re Bukovics), 587 B.R. 695, 706 (Bankr. N.D. Ill. 2018) (quoting O'Hearn v. Educ. Credit Mgmt. Corp. (In re O'Hearn), 339 F.3d 559, 566 (7th Cir. 2003)). Typically, debtors cannot demonstrate undue hardship where the evidence shows they are voluntarily underemployed. See Sederlund v. Educ. Credit Mgmt. Corp. (In re Sederlund), 440 B.R. 168, 175 (B.A.P. 8th Cir. 2010) (holding debtor was not entitled to discharge her student loans where the evidence and testimony showed she was "entirely capable of obtaining full-time, gainful employment, and that she [wa]s voluntarily underemployed"); see also Platt v. U.S. Dep't of Educ. (In re Platt), Adv. Pro. No. 15-50302,

_____

[9] At her deposition, the Debtor acknowledged she could work as a phlebotomist or medical assistant, but it was "more dignified" to use her "knowledge to teach anatomy and physiology."

2018 WL 8367716, at *6 (Bankr. S.D. Ind. May 3, 2018) ("A debtor that is deliberately unemployed or underemployed does not maximize his or her income" and cannot establish undue hardship under § 523(a)(8)) (citation omitted). As the Eighth Circuit has explained: "A debtor is not entitled to an undue hardship discharge of student loan debts when his current income is the result of self-imposed limitations, rather than lack of job skills, and he has not made payments on his student loan debt despite the ability to do so." Jesperson, 571 F.3d at 782 (citation omitted).

We, therefore, conclude the bankruptcy court did not err in determining that the Debtor's current level of income and her potential for increasing her income in the future based on her education and experience weighed against a determination of undue hardship.

## B.    Reasonably Necessary Living Expenses

To discharge student loan debt under § 523(a)(8), a debtor must also "show that her necessary and reasonable expenses leave her with too little to afford repayment." In re Smith, 328 B.R. at 612. "A necessary living expense is one that the debtor cannot cut from the budget and still maintain a minimal standard of living." Id. at 612-13 (citing Savage, 311 B.R. at 841). "It is the debtor's burden to prove that expenses are reasonably necessary." Savage, 311 B.R. at 841 (citation omitted).

Typically, "a debtor cannot establish undue hardship while carrying a monthly surplus or otherwise retaining funds that could be used to pay her student loan debt." In re Abdinoor, 2015 WL 5178364, at *7 (citations omitted); see also State Univ. N.Y. - Student Loan Serv. Ctr. v. Menezes, 352 B.R. 8, 15 (D. Mass. 2006) (reversing bankruptcy court's undue hardship determination where debtor had a monthly surplus of $553 and monthly payments under a repayment program would be less than $70); Brunell v. Citibank (S.D.) N.A. (In re Brunell),

25

356 B.R. 567, 580 (Bankr. D. Mass. 2006) (refusing to find undue hardship where debtor had a monthly surplus from which she could pay her student loans).

The Debtor's monthly expenses at the time of trial totaled about $1,600 and included: $800 for rent; $85 for a storage unit; $108 for car insurance; $45 for renter's insurance; $60 for cell phone charges; $300 for groceries; and $200 for "discretionary expenses." The court did not find these monthly expenses to be unreasonable but determined that, even after paying them, the Debtor had at least $400 of surplus income each month, which she did not save or use to pay her student loans. Rather, the record reflects the Debtor spent her surplus income on unreasonable discretionary expenses like dining out, online shopping, and clothing purchases.[10] She offers no other explanation for where the monthly surplus has gone. And while the Debtor claims she should be entitled to spend some money on herself, she does not explain the disconnect between her claims of poverty and the significant monthly surplus reflected in the record. Accordingly, we conclude that the bankruptcy court did not err in finding the Debtor had sufficient surplus income, after paying her reasonably necessary living expenses, to make some payments toward her student loans.

### C.     Other Relevant Facts or Circumstances

The totality of the circumstances test also requires the court to consider whether there are "'any other relevant facts and circumstances' unique to the particular case . . ." In re Bronsdon, 435 B.R. at 801 (citation omitted).

---

[10]   While the bankruptcy court did not use the word "unreasonable" when describing these additional discretionary expenses, it certainly implied that spending all of her surplus income in such a fashion was unreasonable.

### 1. Eligibility to Participate in Income-Based Repayment Program

Here, the bankruptcy court recognized the magnitude of the Debtor's outstanding debt, stating that "with over $650,000 in outstanding student loan debt, the monthly payment amount outside of an income-based repayment program would likely be insurmountable even were the Debtor to maximize her income." But it ultimately concluded that the Debtor's eligibility to participate in the REPAYE program with monthly payments of only $80 "weigh[ed] heavily against [her] argument that repayment of the student loans would impose an undue hardship." Id. The bankruptcy court did not err in considering these other relevant facts.

It is well established that while the sheer magnitude of a debtor's student loan debt in relation to her financial condition is relevant to the undue hardship inquiry, it is not a determining factor of undue hardship. Jesperson, 571 F.3d at 780 ("[I]t would be perverse to allow the debtor to benefit from [her] own inaction, delay and recalcitrance by automatically granting discharge simply because the debt is a sizeable one.") (citation and internal quotation marks omitted). Further, "[w]hen the size of the debts is the principal basis for a claim of undue hardship," a debtor's eligibility to participate in an income-based repayment program becomes even "more relevant to a totality-of-the-circumstances undue hardship analysis." Id. at 780-81 (citations omitted). Courts in the First Circuit, including the Panel, have held that a debtor's eligibility to participate in an income-based repayment plan is a relevant factor when considering the debtor's ability to repay student loans. See, e.g., In re Bronsdon, 435 B.R. at 802; Ayele v. Educ. Credit Mgmt. Corp. (In re Ayele), 490 B.R. 460, 463 (D. Mass. 2013), aff'd, No. 13-1350, slip op. (1st Cir. Oct. 22, 2013). While not dispositive of the undue hardship inquiry, a debtor's eligibility to participate in an income-based repayment plan is "an influential factor in

27

determining that excepting a debtor's student loan debt from discharge would not impose an undue hardship." In re Smith, 499 B.R. at 64 (citations omitted).

When considering a debtor's eligibility for such a program under the totality of the circumstances test, courts "evaluate both the benefits and drawbacks of the program for the individual debtor within his or her unique circumstances," recognizing that in some situations, there may be adverse tax consequences when the debt is canceled at the end of the repayment period. In re Bronsdon, 435 B.R. at 802 (citation omitted). As many courts have recognized, however, any such tax liability is "strictly contingent on [the debtor's] financial status in the far future" and, therefore, "predictions of tax liability at the conclusion of the [repayment] period are necessarily speculative." Educ. Credit Mgmt. Corp. v. Bronsdon, 421 B.R. 27, 35 (D. Mass. 2009) (citations omitted).

Here, the parties stipulated the Direct Loans were eligible for the REPAYE program and the FFELP Loans would also be eligible once consolidated with the Direct Loans. They also stipulated that under such a program, based on her income at the time of trial, the Debtor would only be required to pay $80 per month and those payments would be reduced if the Debtor's income were to decrease in the future. At the end of the 25-year repayment period, "the entire loan balance, including accrued interest, [would be] forgiven and DOE [would] cancel the debt."

The record reflects that the Debtor had enough surplus each month to make, at a minimum, the estimated $80 monthly payments on her student loans under the REPAYE program. Additionally, under the REPAYE program, any remaining liability at the conclusion of the repayment period, including accrued interest, would be canceled. The Debtor did not argue in the proceedings below that she should not be required to participate in such a program due to potential tax consequences at the end of the plan period or present any evidence demonstrating

28

she would incur any tax liability at that time. Rather, by the Debtor's own admission, her refusal to participate in such a program was not because of any potential adverse tax consequences but simply because she feels she should not be required to pay anything at all toward her student loans. Nor does the Debtor argue on appeal that the bankruptcy court afforded undue weight to her ability to participate in the REPAYE program or that it failed to adequately explore the potential tax implications of debt forgiveness. In fact, the Debtor's brief is entirely silent on these issues and, therefore, any such arguments are waived. See United States v. Bayard, 642 F.3d 59, 63 (1st Cir. 2011) (stating appellant's failure to brief an issue waives it).

In sum, the Debtor's eligibility for the REPAYE program supports the bankruptcy court's conclusion that excepting the debt from discharge would not impose an undue hardship on the Debtor. This is particularly true where, as here, the bankruptcy court specifically held that if the Debtor's application for the REPAYE or similar program were rejected, she could submit another request for discharge of the student loans at that time. See In re Smith, 499 B.R. at 58 (determining no undue hardship because debtor could submit a renewed request to discharge her student loans if her application for an income-driven repayment plan were rejected).

### 2. The Alleged Misconduct of UVM Medical Center and Debtor's "Borrower Defense" Claim Under 34 C.F.R. § 685.206

In the proceedings below, and now on appeal, the Debtor blames her current financial circumstances on the termination of her medical residency at UVM Medical Center and on the misconduct of the program's director. She contends that the bankruptcy court failed to consider these circumstances when making its undue hardship determination.

However, even if the Debtor's entry into the residency program at UVM Medical Center was influenced by the alleged misrepresentations and material omissions of the program's director, and even if the circumstances surrounding the Debtor's departure from the program

29

transpired exactly as she stated at trial, her inability to use her education in the manner she envisioned does not constitute undue hardship under § 523(a)(8). As one court explained, "a student loan borrower strikes a bargain with the government." Murphy, 511 B.R. at 5-6 (citing Brunner v. N.Y. State Higher Educ. Servs. Corp. (In re Brunner), 46 B.R. 752, 756 (S.D.N.Y. 1985), aff'd, 831 F.2d 395 (2d Cir. 1987)). "All bargains contain risks, and it is for each borrower to determine 'whether the risks of future hardship outweigh the potential benefits of a deferred-payment education.'" Id. at 6 (quoting Brunner, 46 B.R. at 756). Here, the Debtor struck her bargain and took a risk when she incurred more than $500,000 in student loan debt to attend medical school. Unfortunately, things did not work out as planned due to circumstances that occurred after she earned her degree. "[T]he fact that this risk has become a reality does not make [her] hardship 'undue.'" Id.

The Debtor's invocation of the so-called "borrower defense" of 34 C.F.R. § 685.206 does not alter the analysis. Because this argument was first developed in the Debtor's appellate briefing, it is waived. See E. Sav. Bank, FSB v. LaFata (In re LaFata), 483 F.3d 13, 22 (1st Cir. 2007) (observing arguments raised for the first time on appeal are deemed waived). Additionally, even if the argument were not waived but, rather, preserved by virtue of the Debtor's scant testimony on the topic at trial, it would fail, as discussed below.

"Title IV [of the Higher Education Act of 1964] authorizes the Secretary [of the DOE] to cancel a federal student loan (in whole or part) and directs her to 'specify in regulations which acts or omissions of an institution of higher education a borrower may assert as a defense to repayment of a loan.'" Sweet v. DeVos, 495 F. Supp. 3d 835, 838 (N.D. Cal. 2020) (citing 20 U.S.C. §§ 1070, 1087e(h)). In exercising that authority, the DOE has promulgated the so-called "borrower defense" regulations, which "provide an avenue for borrowers who took out

student loans directly from the [DOE] to obtain a discharge of their student loans if the school they attended engaged in misconduct." N'Jai v. U.S. Dep't of Educ., No. 19-cv-2712 (DLF), 2021 WL 1209281, at *10 (D.D.C. Mar. 31, 2021).  Under these regulations, a "borrower defense" claim refers to a claim arising out of "'an act or omission of the school attended by the student that relates to the making of a Direct Loan for enrollment at the school or the provision of educational services for which the loan was provided,' and can be invoked either as a 'defense to repayment of amounts owed [but not yet paid] to the Secretary' or as a 'right to recover amounts previously collected by the Secretary.'"  Young v. Grand Canyon Univ., Inc., 980 F.3d 814, 816 (11th Cir. 2020) (quoting 34 C.F.R. § 685.222(a)(5)) (alteration in original).  For loans disbursed prior to July 1, 2017 (such as the student loans at issue here), "a borrower is eligible for . . . a discharge [of student loans] if 'any act or omission of the school attended by the student that relates to the making of the loan for enrollment at the school or the provision of education services for which the loan was provided would give rise to a cause of action against the school under applicable State law.'"  N'Jai, 2021 WL 1209281, at *10 (quoting 34 C.F.R. § 685.206(c)(1)) (other citation omitted).

Unfortunately for the Debtor, the commencement of an adversary proceeding to discharge student loan debt for undue hardship under § 523(a)(8) of the Bankruptcy Code is not the appropriate procedural vehicle in which to raise a "borrower defense" claim under these regulations.  "[B]orrower defense claims 'must be asserted, and will be resolved, under the procedures in § 685.222(e) to (k),' 34 C.F.R. § 685.206(c)(2), which require[], among other things, a borrower to '[s]ubmit an application to the Secretary [of the DOE],' id. § 685.222(e)(1)(i), who then 'designates a Department official' to review the application and

31

resolve the claim in a written decision, id. § 685.222(e)(3)-(5)." N'Jai, 2021 WL 1209281, at *10. "If the defense asserted by the borrower is successful, '. . . the borrower is relieved of the obligation to repay all or part of the loan . . . .'" Negash v. DeVry Univ., No. 17-10256, 2018 WL 1570625, at *7 (E.D. Mich. Mar. 30, 2018) (34 C.F.R. § 685.206(c)). Here, there is no evidence in the record the Debtor ever submitted such an application to the DOE or otherwise complied with the DOE's administrative process.

Further, a borrower defense claim can only be raised if the cause of action arises from an "act or omission of the school attended by the student that relates to the making of the loan for enrollment at the school or the provision of educational services for which the loan was provided . . . ." 34 C.F.R. § 685.206(c). Here, the Debtor received loans from the DOE to fund her graduate education at the University of Massachusetts Amherst and St. George's University School of Medicine. The Debtor's allegations of misconduct and misrepresentation are against the psychiatric residency program at UVM Medical Center, not against either of the schools for which the student loans were obtained. The Debtor did not attend the University of Vermont as a student, and she did not take out student loans in connection with her participation in the UVM Medical Center residency program. In fact, she was a paid *employee* of UVM Medical Center. The Debtor's claims, therefore, do not relate to the "educational services for which the loan[s] w[ere] provided," and the "borrower defense" regulations are inapplicable to the Debtor's student loans.[11]

---

[11] We are unpersuaded by the Debtor's argument, raised for the first time at oral argument, that the "borrower defense" is somehow applicable here because the DOE is a federal agency and the residency program at UVM Medical Center is funded by Medicare, a federal program. There simply is no legal support for the Debtor's position.

**D.      Summary of the Undue Hardship Analysis**

In sum, we conclude the bankruptcy court did not err in ruling, based on the totality of the circumstances, that the Debtor, with the aid of an income-based repayment plan, can make student loan payments while maintaining a reasonable, minimal standard of living.

## CONCLUSION

For the reasons set forth above, we discern no error in the bankruptcy court's ruling that the Debtor failed to prove, by a preponderance of the evidence, that she was entitled to an undue hardship discharge under § 523(a)(8).  Therefore, the Second Amended Judgment is **AFFIRMED**.